2006 UT 22

**SWAN CREEK VILLAGE HOME-OWNERS ASSOCIATION,
Plaintiff and Appellee,**

v.

**Alicia WARNE, a minor, appearing through her father, Jeff Warne,
Defendant and Appellant.**

No. 20040884.

Supreme Court of Utah.

April 4, 2006.

Craig G. Adamson, Eric P. Lee, Debra G. Griffiths, Salt Lake City, for plaintiff.

J. Craig Smith, D. Scott Crook, R. Christopher Preston, Salt Lake City, for defendant.

PARRISH, Justice:

¶ 1 In this appeal, we are asked to determine the validity of an assessment levied by a homeowners association. Swan Creek Village Homeowners Association brought this action against Alicia Warne for failure to pay an assessment on lots in Swan Creek Village that she purchased at a tax sale. The district court granted Swan Creek's motion for summary judgment. Alicia Warne appeals, arguing that the summary judgment should be vacated because (1) the district court abused its discretion when it allowed Swan Creek to amend its complaint to substitute her (in place of her father) as the real party in interest; (2) she was not given the requisite notice of the assessment; (3) Swan Creek's claims were barred by the statute of limitations; (4) Swan Creek lacked authority to assess her property; and (5) the assessment was not authorized because it was an attempt to revive a prior assessment that had been extinguished by the tax sale at which she acquired the lots. Because we agree with Alicia Warne that the assessment was not authorized, we vacate the summary

judgment entered by the district court and enter judgment in her favor.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Swan Creek Village, located in Rich County, Utah, was designed as a 500–plus home development to be completed in multiple phases. In 1979, the developer incorporated the Swan Creek Village Homeowners Association (the "Original Association") and thereafter recorded with Rich County a "Declaration of Reservations, Restrictions and Covenants of Swan Creek Village" (the "Declaration"). The Declaration recognized that the Original Association had been created for the purpose of furthering the community welfare of the property owners in the Swan Creek subdivision, and it bestowed upon the Original Association the power to perform many functions as an agent of the lot owners, including the power to impose, collect, and disburse assessments.

¶ 3 The developer declared bankruptcy and pulled out of Swan Creek midway through its development. Abandoned by the developer, the Original Association failed to file its annual report or pay its filing fee and was involuntarily dissolved on March 31, 1986. Mark Bryner, a lot owner, attempted to have the Original Association reinstated. But his attempt failed because his application to reinstate the Original Association was filed more than one year from the time of its dissolution.[1]

¶ 4 In a continued effort to secure a vehicle for the collective governance of Swan Creek, Bryner incorporated a new homeowners association (the "HOA"), using the identical name and articles of incorporation used by the Original Association. A certificate of incorporation for the HOA was issued on April 28, 1988. Shortly thereafter, Bryner called a meeting of all Swan Creek lot owners. More than 100 people, representing almost half of the lot owners, attended the meeting and elected a board of directors for the HOA.

---

1. Utah Code section 16–6–99(4) (1986), which took effect just three days prior to Bryner's application, barred consideration of a reinstatement application made more than one year after a

homeowners association's dissolution. This provision corresponds to current Utah Code section 16–6a–1412 (Supp.2005).

¶ 5 Alicia Warne now disputes whether there were sufficient votes at the meeting to authorize the HOA and whether those voting understood that the HOA was a new entity and not merely a reinstatement of the Original Association. No such questions were raised at the time, however, and the new HOA immediately began to act under the terms of the Declaration.

¶ 6 On May 13, 1989, the board of directors voted to levy a special assessment of $5,900 (the "1989 Assessment") against each lot to cover the cost of certain improvements that had been made to Swan Creek. This 1989 Assessment was levied against all lots in Swan Creek; however, credits were given to those lot owners who had already contributed to the improvements in question.

¶ 7 In the early 1990s, the HOA was party to litigation in the First Judicial District Court for Rich County, State of Utah. One of the issues raised by the litigation was the authority of the HOA to levy assessments pursuant to the terms of the Declaration. The court ruled in favor of the HOA, concluding that the HOA was properly formed and had the authority to impose assessments on the owners of lots in Swan Creek. However, the court limited its holding to the action before it. *Swan Creek Vill. Homeowners Ass'n v. Cook–Rex Darrington Sorenson Trust*, Civil No. 1568, Findings of Fact and Conclusions of Law (1st Dist.Ct.Utah, July 20, 1992).

¶ 8 When certain lot owners failed to pay the 1989 Assessment, the HOA placed liens on the corresponding lots. Rich County owned four of these lots, having earlier been issued fee simple title by the Rich County Auditor in payment of general taxes, interest, costs, and penalties. Jeff Warne purchased these four lots at a May 24, 1994 tax sale on behalf of his then two-year-old daughter Alicia.

¶ 9 Shortly thereafter, the HOA sent Jeff Warne and other lot owners a letter demanding payment of the 1989 Assessment. After certain lot owners argued that the 1994 tax sale had extinguished any obligation for the 1989 Assessment, the HOA imposed a new assessment (the "1996 Assessment") and issued the following statement:

The Homeowners association of Swan Creek Village levied an improvement assessment in the amount of $5,900 on May 13, 1989. There have been questions on the legality of this assessment on lots purchased at tax sale after this date. In order to remove any question concerning the validity of this assessment and lien after tax sale, a new assessment is being made at this time.

¶ 10 The 1996 assessment was identical to the 1989 Assessment and, like the 1989 Assessment, was levied against all lots constructed in the first two phases of the development. Like the 1989 Assessment, the 1996 Assessment gave credits to those who had already contributed to the improvements for which the 1996 Assessment was levied. Swan Creek directed notice of the 1996 Assessment to Jeff Warne, who refused to pay.

¶ 11 The HOA filed suit against Jeff Warne on May 3, 2001, seeking to enforce and collect the 1996 Assessment. During initial discovery, Jeff Warne notified the HOA that he was not the real party in interest. According to the HOA, it requested clarifying information from Jeff Warne's attorney regarding the identity of the proper party, but never received a response.

¶ 12 The issue resurfaced when Jeff Warne moved for summary judgment, arguing that the case should be dismissed because the lots in question were actually owned by his minor daughter Alicia Warne. In response, Swan Creek indicated that it was prepared to substitute Alicia Warne as defendant in the action. It noted, however, that the amendment would have no practical effect because Alicia Warne would be required to be represented by a general guardian or guardian ad litem who, in either case, would likely be Jeff Warne.

¶ 13 After taking the matter under advisement, the district court allowed the HOA to amend its complaint for the purpose of substituting Alicia Warne as defendant. Jeff Warne thereafter continued defending the litigation on her behalf.

¶ 14 The HOA then moved for summary judgment. The district court granted the HOA's motion, awarding judgment in its fa-

vor. It held that while the HOA was a new entity, distinct from the Original Association, it was properly incorporated and acting within its power, as granted in the Declaration, in levying and collecting the 1996 Assessment. It also held that the six-year statute of limitations on the 1996 Assessment did not begin to run until 1996 and therefore had not expired at the time the HOA filed suit. Alicia Warne now appeals. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## STANDARD OF REVIEW

¶ 15 We review the district court's decision allowing the HOA to amend its complaint to substitute Alicia Warne as defendant for abuse of discretion. *Jones v. Salt Lake City Corp.,* 2003 UT App 355, ¶ 7, 78 P.3d 988.

¶ 16 We review the district court's decision to grant summary judgment "for correctness, granting no deference to the [district] court." *Pugh v. Draper City,* 2005 UT 12, ¶ 7, 114 P.3d 546. In reviewing the summary judgment, we recognize that "[s]ummary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Norman v. Arnold,* 2002 UT 81, ¶ 15, 57 P.3d 997.

## ANALYSIS

¶ 17 We begin by addressing Alicia Warne's procedural claim that the district court abused its discretion when it allowed the HOA to amend its complaint. Finding the amendment proper, we move to her substantive claims. We first address Alicia Warne's claim that the HOA lacks authority to levy assessments on the Swan Creek lots. Concluding that it does have such authority, we turn to Alicia Warne's specific challenges to the 1996 Assessment. These challenges include her claim that the HOA cannot enforce the 1996 Assessment because it failed to provide her with the requisite notice of its imposition and her claim that the HOA's lawsuit was barred by the statute of limitations. We finally address Alicia Warne's claim that the 1996 Assessment was invalid because it constituted an improper attempt to resuscitate the 1989 Assessment, which had been extinguished by the tax sale.

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING THE HOA TO SUBSTITUTE ALICIA WARNE AS DEFENDANT

¶ 18 Alicia Warne argues that the district court erred when it allowed the HOA to amend its complaint to substitute her as defendant in place of her father Jeff Warne. We review a district court's decision to grant an amendment of the pleadings for abuse of discretion resulting in prejudice. *Jones v. Salt Lake City Corp.,* 2003 UT App 355, ¶ 8, 78 P.3d 988. Upon examining the relevant facts, we are convinced that the district court did not abuse its discretion in allowing the HOA to amend its complaint.

¶ 19 Rule 15(a) of the Utah Rules of Civil Procedure states that, after the responsive pleadings have been filed, "a party may amend his [or her] pleading[s] only by leave of court or by written consent of the adverse party; and leave shall be given when justice so requires." On review, we give considerable deference to the district court, as it is "best positioned to evaluate the motion to amend in the context of the scope and duration of the lawsuit." *Smith v. Grand Canyon Expeditions Co.,* 2003 UT 57, ¶ 32, 84 P.3d 1154.

¶ 20 In *Kelly v. Hard Money Funding, Inc.,* 2004 UT App 44, ¶ 26, 87 P.3d 734, the Utah Court of Appeals summarized the law regarding rule 15(a), as it has been interpreted by this court. *See also Reg'l Sales Agency, Inc. v. Reichert,* 830 P.2d 252 (Utah 1992). The court of appeals observed that this court has generally focused on three factors in deciding whether a district court properly granted a motion for leave to amend: (1) timeliness; (2) prejudice; and (3) justification. *Kelly,* 2004 UT App 44, ¶ 26, 87 P.3d 734. Explaining the first factor, the *Kelly* court noted that "motions to amend are typically untimely when they are filed in the advanced procedural stages of the litigation process." *Id.* ¶ 29. The rationale for this

factor is that "the ongoing passage of time makes it increasingly difficult for the non-moving party to *effectively respond* to the *new* allegations." *Id.* ¶ 30 (emphasis added).

¶ 21 The general rule regarding prejudice is that an amendment should be denied when "the opposing side would be put to unavoidable prejudice by having an issue adjudicated for which he [or she] had *no time to prepare.*" *Kasco Servs. Corp. v. Benson,* 831 P.2d 86, 92 (Utah 1992) (emphasis added) (internal quotation marks omitted). We have been careful to limit the scope of "prejudice" within this rule, requiring that there be "undue or substantial prejudice, because almost every amendment of a pleading will result in some 'practical prejudice' to the opposing party." *Kelly,* 2004 UT App 44, ¶ 31, 87 P.3d 734.

¶ 22 The justification factor focuses on "whether the moving party had knowledge of the events that are sought to be added." *Id.* ¶ 32. Utah courts have generally adopted the United States Supreme Court's narrow rule focusing on whether the motion to amend was filed as the result of a dilatory motive, bad faith, or unreasonable neglect on the part of the movant. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). While the requirements for finding a dilatory motive, bad faith, or unreasonable neglect have not been expressly defined, the Utah Court of Appeals has correctly noted that "where the party's prior knowledge was minimal, or where it was instead based on suspicious or inconclusive evidence, the party's decision to hold off on pleading those allegations until reliable confirmation could be obtained should not serve as grounds for procedural default." *Kelly,* 2004 UT App 44, ¶ 38, 87 P.3d 734.

¶ 23 Here, although the HOA's motion for leave to amend came three years into litigation and right before trial, the tardiness of the HOA's amendment does not strike a chord with the harm contemplated by the timeliness factor, nor did the tardiness of the amendment prejudice Alicia Warne. The amendment introduced no new substantive issues that would require more time for preparation. Indeed, as a practical matter, the only change effectuated by the amendment was that Jeff Warne began defending the suit in his capacity as an agent for his minor daughter rather than in his personal capacity. And although Alicia Warne argues that the amendment forced her to examine issues of agency, these issues do not go to the substance of the dispute.

¶ 24 We next turn to the justification prong. Although the HOA's initial belief that Jeff Warne was the record title holder was understandable, it is unclear why the HOA was not more diligent in attempting to identify the correct defendant, especially when Jeff Warne notified the HOA early in the litigation that he was not the real party in interest. The HOA suggests that it never received a response to its request for additional information regarding the identity of the real party in interest, that it believed Jeff Warne to be the appropriate party, and that it was not required to name Alicia Warne because she was a minor. It does not appear that the HOA's failure to amend was the result of "a dilatory motive, bad faith, or unreasonable neglect," *Foman,* 371 U.S. at 179, 83 S.Ct. 227. We therefore conclude that the delay in seeking to substitute Alicia Warne as defendant was not unjustified.

¶ 25 Having considered the factors of timeliness, prejudice, and justification, we cannot conclude that the district court abused its discretion in allowing the amendment. We therefore affirm the order granting the HOA leave to amend and move to the substantive issues.

## II. THE HOA GAVE ALICIA WARNE SUFFICIENT NOTICE OF THE ASSESSMENTS

¶ 26 The Declaration requires that the HOA furnish each lot owner with "written notice" of all assessments. Alicia Warne points out that the HOA addressed all correspondence regarding the assessments to her father. Because she never received the requisite notice, she argues that she should be excused from responsibility for the assessments. We disagree because the notice received by Jeff Warne was properly imputed to Alicia Warne.

¶ 27 Under Utah law, "the knowledge of an agent concerning the business which he is transacting for his principal is to be imputed to his principal." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 16, 61 P.3d 1009 (internal quotation marks and brackets omitted). It is undisputed that Jeff Warne acted as Alicia Warne's agent when he purchased the lots for her, a relationship that has continued to this day, as demonstrated by his payment of the property taxes on the lots and his defense of this lawsuit. Indeed, considering her age at the time Jeff Warne purchased the lots on her behalf, Alicia Warne probably was unaware that she owned the lots at all. We are therefore comfortable imputing the notice received by Jeff Warne to Alicia Warne.

## III. THE STATUTE OF LIMITATIONS DOES NOT BAR THE HOA'S CLAIM

¶ 28 We next turn to Alicia Warne's contention that the HOA's claim is barred by the applicable statute of limitations. This case is an action on a "contract . . . founded upon an instrument in writing" governed by the six-year limitations period of Utah Code section 78–12–23(2) (2002).

¶ 29 Alicia Warne asserts that the statute of limitations began running in 1989 because the 1996 Assessment was merely an attempt to revive the 1989 Assessment. We disagree. Even if the 1996 Assessment represented an effort to collect amounts unpaid from earlier assessments, it was still a new assessment. In so concluding, we do not decide whether the 1996 Assessment was valid, an issue we address below. Rather, our holding is limited to the conclusion that the statute of limitations did not begin running on the 1996 Assessment until 1996, the year in which it was levied by the HOA.

## IV. THE SWAN CREEK HOMEOWNERS ASSOCIATION HAS ASSESSMENT AUTHORITY OVER LOT OWNERS IN THE SUBDIVISION

¶ 30 We now turn to Alicia Warne's claim that the HOA lacks authority to impose assessments on property owners in the Swan Creek subdivision. Although Alicia Warne recognizes that the Original Association would have had authority to levy such assessments, *see* Utah Code Ann. § 57–3–102(1) (2000) (indicating that duly recorded documents "impart notice to all persons of their contents"), she claims that the HOA lacked this authority because it is not the association contemplated under the Declaration and because an insufficient number of lot owners voted to ratify its authority. In essence, she urges us to conclude that the assessment power terminated with the defunct Original Association, thereby leaving the HOA without assessment authority.

¶ 31 We agree with Alicia Warne that the record fails to establish any formal amendment of the Declaration recognizing the HOA. We similarly agree that there appear to be disputed issues of fact with respect to whether a majority of the lot owners formally approved the substitution of the HOA following the involuntary dissolution of the Original Association. But we disagree that these facts are material. Indeed, we need not decide these issues because we find that the HOA's authority to impose assessments on Swan Creek lot owners pursuant to the terms of the Declaration has been repeatedly ratified by the lot owners over a period of many years. Therefore, using our equitable powers, we declare the HOA to be a valid association authorized to impose assessments pursuant to the terms of the Declaration.

¶ 32 Our equitable powers extend to situations where their invocation is necessary to correct mistakes and oversights and to protect the public interest. In the spirit of this principle, we call on our equitable powers to affirm the HOA's authority to levy assessments here. Where property owners have treated an association as one with authority to govern and impose assessments contemplated under the terms of a duly recorded governing declaration, they ratify its authority to act.

¶ 33 Although we have not previously addressed ratification in the context of homeowners associations, such an exercise of our equitable powers is consistent with over a hundred years of Utah case law in similar contexts. From early in this state's exis-

tence, we have relied on the doctrine of ratification in cases raising questions regarding corporate authority. In *Marsh v. Mathias*, 19 Utah 350, 56 P. 1074, 1076 (1899), we considered the validity of a corporation's amendment to its bylaws. In order to amend the bylaws, two-thirds of the stockholders had to vote for the amendment. *Id.* But it was not clear from the record whether the requisite percentage of stockholders had attended the meeting. *Id.* Despite the lack of evidence on this point, other evidence supported the notion that the amendment had been validly adopted. For instance, the amended bylaw was "found in the records of the corporation, and [had] been acted upon and acquiesced in for a period of more than eleven years." *Id.* Additionally, stockholders had been given statements each year, and the amended bylaw had "been uniformly acted upon and enforced since its adoption." *Id.* In view of "all these circumstances, we ... presume[d] that [the amendment] was regularly and duly adopted." *Id.* In other words, the subsequent acts of stockholders ratified the amendment's existence.

¶ 34 The basic, equitable principle articulated by this court in *Marsh* is still valid today and has been applied often in more recent cases, albeit in different contexts. The availability of equitable relief helps to ensure that justice is met and prevents parties from avoiding valid obligations due to technicalities. Particularly in contract cases, we have relied on the principle of ratification to establish the validity of an act even though certain, express formalities have not been met. *See Aggeller & Musser Seed Co. v. Blood*, 73 Utah 120, 272 P. 933, 937 (1928) (indicating that "acceptance of services rendered with full knowledge of the contract under which rendered is a ratification of such contract"). We have found ratification "under circumstances of acquiescence or where a duty to disaffirm is not promptly exercised." *Lowe v. April Indus., Inc.*, 531 P.2d 1297, 1299 (Utah 1974) (holding that "delay in repudiation gives rise to an implied or de facto ratification of [a] contract"); *Cache Valley Banking Co. v. Logan Lodge No. 1453, B.P.O.E.*, 88 Utah 577, 56 P.2d 1046, 1047–48 (1936) ("Ratification may be implied by acquiescence in, or recognition of, the act of the

officers by the corporation or by acts tending to show an acceptance or adoption of the contract.").

¶ 35 We have also called on other equitable principles to achieve substantial justice. For example, equitable estoppel allows us to modify a contract or prevent a party from denying the validity of a contract when one party has relied on another party's conduct. *See, e.g., Blackhurst v. Transamerica Ins. Co.*, 699 P.2d 688, 691 (Utah 1985) (listing the elements of equitable estoppel); *Tanner v. Provo Reservoir Co.*, 76 Utah 335, 289 P. 151, 154 (1930) ("It has been repeatedly held that a person by acceptance of benefits may be estopped from questioning the existence, validity and effect of a contract."). Additionally, we have adopted a principle "where a party recovering a judgment or decree [who] accepts the benefits thereof, voluntarily and knowing the facts ... is estopped to afterwards reverse the judgment or decree on error." *Ottenheimer v. Mountain States Supply Co.*, 56 Utah 190, 188 P. 1117, 1118 (1920) (internal quotation marks omitted).

¶ 36 Other courts have called on such equitable principles in affirming the authority of homeowners associations. For example, in *Evergreen Highlands Ass'n v. West*, 73 P.3d 1, 7 (Colo.2003), the Colorado Supreme Court held that even though a homeowners association may not have "an express covenant imposing mandatory assessments, it has the implied power to collect assessments from its members." It reasoned that to promote efficient property management, it is necessary that "homeowner associations have the implied power to levy dues or assessments even in the absence of express authority." *Id.; see also Seaview Ass'n v. Williams*, 69 N.Y.2d 987, 517 N.Y.S.2d 709, 510 N.E.2d 793, 794 (1987) (indicating that homeowners have an implied-in-fact contract with the association when they buy property knowing that the association manages it); *Perry v. Bridgetown Cmty. Ass'n*, 486 So.2d 1230, 1234 (Miss.1986) (stating that "the declaration gives rise to review in law or equity").

¶ 37 These cases illustrate the wide variety of equitable remedies on which courts rely to validate the authority of a corporation or association. We employ just such equitable principles in rejecting Alicia Warne's asser-

tion that the HOA lacked authority to assess the property in Swan Creek because of the technicality that it is a different association from the one identified in the Declaration.

¶ 38 In reaching this conclusion, we rely on the fact that the HOA has acted as a valid association for almost twenty years, during which time the lot owners have collectively accepted its management. Lot owners have paid their dues to the HOA, it has managed the property in Swan Creek, and no competing association has emerged. In fact, in 1994, only 24 of the 538 lot owners had not paid the $5,900 assessment levied by the HOA. We also rely on the fact that the HOA's articles of incorporation and the Declaration were on file and had been on file for years before Alicia Warne acquired her lots. Moreover, in a lawsuit resolved before Alicia acquired her lots, the First Judicial District Court for Rich County specifically held that the HOA was "properly formed" and had the power to levy and to "collect the past due assessments." *Swan Creek Vill. Homeowners Ass'n v. Cook–Rex Darrington Sorenson Trust*, Civil No. 1568, Findings of Fact and Conclusions of Law (1st Dist.Ct.Utah July 20, 1992). While this holding was specifically limited to that action, *id.*, it was a matter of public record, therefore putting Alicia Warne on notice that the HOA was acting in the capacity of the association contemplated under the Declaration.

¶ 39 Under these circumstances, and with this pattern of acquiescence by the lot owners, we exercise our equitable power to hold that the HOA possesses the authority delegated to the homeowners association by the Declaration.[2] Such was the case at the time Alicia Warne acquired her lots, and it is the case now.

## V. THE VALIDITY OF THE 1996 ASSESSMENT DEPENDS ON THE TERMS OF THE DECLARATION AND THE NATURE OF THE IMPROVEMENTS

¶ 40 Having determined that the HOA has authority to levy assessments on the Swan Creek property owners, we address whether Alicia Warne was required to pay the 1996 Assessment. Warne argues that the 1996 Assessment was invalid because it was, in reality, an attempt to resuscitate the 1986 Assessment that had been extinguished by the tax sale. We agree.

■ ¶ 41 It is well-settled that liens on real property are extinguished by a tax sale. *See A.C. Fin. v. Salt Lake County*, 948 P.2d 771, 776 (Utah 1997); *Hanson v. Burris*, 86 Utah 424, 46 P.2d 400, 406 (1935), *aff'd by Ingraham v. Hanson*, 297 U.S. 378, 56 S.Ct. 511, 80 L.Ed. 728 (1936). A similar rule applies to foreclosure sales. *See* Restatement (Third) of Property § 6.5 cmt. 9 (2000). This is necessary in order "to provide a means whereby a party with no interest in the property can pay delinquent taxes in exchange for clear title to the property." *Buchanan v. Hansen*, 820 P.2d 908, 909 (Utah 1991). We therefore conclude that the lien securing the 1989 Assessment was extinguished by the tax sale and that Alicia Warne had no obligation to pay the 1989 Assessment.

■ ¶ 42 Although the tax sale extinguished the 1989 Assessment, it did not extinguish the HOA's authority to levy new assessments on property purchased at the sale. *See* Restatement (Third) of Property § 6.5 cmt. 9 (2000). We must therefore confront the thorny issue presented here— whether an association may levy on property purchased at such a sale a new assessment for previously incurred obligations. While this is an issue of first impression in Utah, courts from other jurisdictions have addressed it. *See, e.g., Kingsmill Vill. Condo. Ass'n v. Homebanc Fed. Sav. Bank*, 204 Ga. App. 900, 420 S.E.2d 771 (1992).

¶ 43 In *Kingsmill Village*, a bank acquired a condominium at a foreclosure sale, and the court held that it was not solely responsible

---

2. In arguing against the result we reach, Alicia Warne relies upon *Dansie v. Hi–Country Estates Homeowners Ass'n*, 1999 UT 62, ¶ 18, 987 P.2d 30. *Dansie* is distinguishable because the lot at issue there was not explicitly covered by the terms of the association's declaration. In contrast, the language of the Declaration in this case specifically covers the lots owned by Alicia Warne.

for an unpaid assessment levied on the property prior to the bank's assuming title. *Id.* at 773. The court reasoned that after the foreclosure sale, the unpaid assessment became part of the common expenses. Therefore, the court suggested that the association could require the bank to pay only a pro rata portion of the assessment. *Id.* Reasoning that the "substance" of the claim was a "recoupment of past assessments," the court refused to allow "[a] party [to] do indirectly what the law does not allow to be done directly." *Id.* at 773 (citation omitted); *see also First Fed. Sav. Bank v. Eaglewood Court Condo. Ass'n,* 186 Ga.App. 605, 367 S.E.2d 876, 877 (1988) (holding that mortgagee which foreclosed condominium unit was not liable for an unpaid assessment but rather a pro rata amount of the unpaid share according to statute); *Lakes of the N. Ass'n v. TWIGA Ltd. P'ship,* 241 Mich.App. 91, 614 N.W.2d 682, 687 (2000) (indicating that "parties agree that a lien for past due assessments ... does not survive a tax sale," but legislative intent was that covenants do subsist); *Micheve, L.L.C. v. Wyndham Place at Freehold Condo. Ass'n,* 370 N.J.Super. 524, 851 A.2d 743, 746–47 (Ct.App.Div.2004) (indicating that a condominium statute did not permit an association to collect back maintenance fees from buyer after sheriff's sale).

▪ ¶ 44 Many of these decisions are premised on state statutes that bear on the validity of reassessments following foreclosures. *See id.* But at the time the HOA filed this action, Utah had no such statute. We therefore decline to follow the rules adopted by these courts. Instead, we conclude that basic principles of contract law govern the validity of the 1996 Assessment. Specifically, we hold that the validity of the assessment against Alicia Warne turns upon the specific provisions of the Declaration establishing the homeowners association and conferring its assessment authority. We choose this approach because both Utah statutes and case law recognize that such associations are controlled by their governing documents, which in fact constitute a contract

between the association and the property owners.[3]

¶ 45 Statutes in effect at the time Alicia Warne acquired the lots contemplated that she would be subject to the HOA's governing documents. For example, one statute provided that duly recorded documents "impart notice to all persons of their contents." Utah Code Ann. § 57–3–102(1) (1986). Although not directly applicable, the Utah Condominium Ownership Act, Utah Code Ann. §§ 57–8–1 to –36 (1986), similarly provided that "[e]ach unit owner shall comply strictly with the covenants, conditions, and restrictions as set forth in the declaration." *Id.* § 57–8–8.

¶ 46 Utah case law similarly recognizes the importance of an organization's governing documents. In fact, "[i]t is well established precedent that the bylaws of a corporation, together with the articles of incorporation ... constitute a contract between the member[s] and the corporation." *Turner v. Hi-Country Homeowners Ass'n,* 910 P.2d 1223, 1225 (Utah 1996) (internal quotation marks omitted); *see also Workman v. Brighton Props., Inc.,* 1999 UT 30, ¶ 10, 976 P.2d 1209 ("The binding nature of these article, bylaw, and covenant provisions is settled under Utah law."). This contractual authority is broad and requires landowners to pay a full assessment if "the terms of the governing documents" allow for such an assessment, even if the individual landowners do not benefit from it. *Id.* ¶ 14.

¶ 47 Because the Declaration governs the obligations of the lot owners, *see Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.,* 2004 UT 54, ¶ 10, 94 P.3d 292, we look to its terms in determining the validity of the 1996 Assessment. This is consistent with how our courts, as well as courts across the country, typically defer to the language of the governing documents when determining an association's right to levy assessments, reapportion unpaid assessments following tax or foreclosure sales, and collect attorney fees. *See, e.g., Johannessen v. Canyon Rd. Towers*

---

**3.** Although not in effect at the time of this action, such an approach is also consistent with the Community Association Act, which provides that the amount and timing of any assessments must be "in accordance with the terms of the ... declaration." Utah Code Ann. § 57–8a–201(2) (Supp.2005).

*Owners Ass'n,* 2002 UT App 332, ¶¶ 19, 28, 57 P.3d 1119 (indicating that an agreement between unit owner and association to lower monthly assessment violated the Condominium Ownership Act and the declaration, which required consent of all unit owners); *Citicorp Sav. v. Bhatti,* 173 Ill.App.3d 170, 122 Ill.Dec. 926, 527 N.E.2d 424 (1988) (holding that the terms of a declaration rendered the mortgagee liable for an amount equal to unpaid common and special assessments); *Lion Square Phase II & III Condo. Ass'n v. Hask,* 700 P.2d 932 (Colo.Ct.App.1985) (indicating that a condominium declaration provided recovery of costs and attorney fees for action to foreclose liens and nonpayment of assessments).

¶ 48 In summary, because the HOA was a valid association operating pursuant to a duly recorded Declaration, those purchasing property in Swan Creek were contractually bound to its terms. When Alicia Warne acquired her lots, she bound herself to the terms of the Declaration. She is therefore obligated to pay the 1996 Assessment to the extent that it was authorized under the Declaration.

¶ 49 In granting summary judgment in favor of the HOA, the trial court ruled that the 1996 Assessment was "levied pursuant to express authority provided [in the Declaration], and was made in accordance with [its] requirements." Alicia Warne challenges that conclusion, arguing that the Declaration neither authorized the HOA to impose assessments on selected lot owners nor empowered the HOA to revive assessments extinguished by tax or foreclosure sales. In so arguing, Warne points to the HOA's admission that the 1996 Assessment was not a new assessment. Rather, it was an admitted attempt to reimpose on selected lot owners the 1989 Assessment that had been extinguished by the tax sale.

¶ 50 Had the Declaration authorized selective imposition of assessments under circumstances such as those presented here, we would be constrained to uphold them. Such an approach would be consistent with the principle that the Declaration constitutes a contract between the HOA and its members and with the fact that a recorded Declaration imparts notice of its contractual terms to all who acquire property subject to it. In the absence of such explicit authorization, however, we must agree with Alicia Warne that the HOA lacks authority to revive assessments extinguished by tax sale.

¶ 51 We therefore turn to the terms of the Declaration. They support Alicia Warne's contention that assessments are to be uniform and that each property owner is responsible for only a proportionate share of expenses. Paragraph 17(d) of the Declaration, which outlines the powers of the association, states that the association has "the power to assess and collect from *every member* of the association *a uniform monthly charge per single-family residential lot within the subdivision* " (emphasis added). Paragraph 9 of the Declaration states that "[e]ach lot owner shall pay the management committee or association his *allocated portion* of the cash requirement deemed necessary . . . to manage and to meet the expenses incident to the running of the association and upkeep of the development" (emphasis added). And paragraph 10 defines the cash requirement as the "aggregate sum" to be paid by "all the owners then in existence."

¶ 52 Nothing in the Declaration suggests that the HOA may impose nonuniform assessments or levy assessments on only selected lot owners or that it may achieve that result by purporting to impose a new assessment on all lot owners and then relieving certain lot owners from responsibility for the assessment by crediting them for payments made toward prior assessments. Indeed, paragraph 17(d)(2) of the Declaration provides that every person acquiring a lot thereby is "held to have agreed to pay the association all charges that the association *shall* make" (emphasis added). It is significant that the Declaration uses the future tense—it does not provide that those acquiring lots are liable for prior assessments. This interpretation is consistent with paragraph 11 of the Declaration, which states that "[e]ach monthly assessment and each special assessment shall be separate, distinct and personal to the owners of the lot against which the same is assessed."

¶ 53 We accordingly vacate the summary judgment entered in favor of the HOA and enter judgment in favor of Alicia Warne.

Because this result may initially appear unfair to those lot owners who paid the assessment at issue, we note that the HOA could have prevented this result by foreclosing on its lien prior to the tax sale or by appearing at the tax sale and bidding on the lots. Moreover, Alicia Warne will not be entirely relieved from responsibility for the assessment because the HOA retains the authority to levy assessments for the common expenses of the association. Any revenue shortfall resulting from the unpaid assessments will presumably contribute to the common expenses of the association, and it remains within the authority of the HOA to impose a new assessment on all lots (including those owned by Alicia Warne) requiring lot owners to pay their pro rata share of those expenses.

## CONCLUSION

¶ 54 We conclude that the district court acted within its discretion when it allowed Swan Creek to amend its complaint to substitute Alicia Warne as defendant in place of her father. Similarly, because Jeff Warne acted as Alicia's agent, his notice of the 1996 Assessment was appropriately imputed to Alicia. We also conclude that the HOA's claim was filed within the applicable statute of limitations.

¶ 55 We rely on our equitable power to hold that the HOA possesses the authority to levy assessments on property in the Swan Creek subdivision because the lot owners collectively ratified its authority to act as the association contemplated by the Declaration and it was operating in that capacity at the time Alicia Warne acquired her interest in the lots. Although the HOA possesses the authority to levy assessments, the district court erred by entering summary judgment in favor of the HOA because the Declaration does not authorize the HOA to selectively reimpose assessments extinguished by tax sales. We therefore vacate the summary judgment entered by the district court and remand for the entry of judgment in favor of Alicia Warne, the parties to bear responsibility for their own costs and fees.

¶ 56 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice NEHRING, and Judge THORNE concur in Justice PARRISH'S opinion.

¶ 57 Having disqualified himself, Justice DURRANT does not participate herein; Court of Appeals Judge WILLIAM A. THORNE sat.