2013 UT App 20

# THE UTAH COURT OF APPEALS

OSMOND LANE HOMEOWNERS ASSOCIATION,

*Plaintiff and Appellee,*

*v.*

GEORGE C. LANDRITH JR.,

*Defendant and Appellant.*

Opinion
No. 20090157-CA
Filed January 25, 2013

Fourth District, Provo Department
The Honorable Lynn W. Davis
No. 060400414

Russell A. Cline, Attorney for Appellant
Thomas W. Seiler and Aaron D. Lancaster, Attorneys for
Appellee

JUDGE GREGORY K. ORME authored this Opinion,
in which JUDGES WILLIAM A. THORNE JR.
and J. FREDERIC VOROS JR. concurred.

ORME, Judge:

¶1     Among other issues, George C. Landrith Jr. appeals the trial court's denial of his motion for summary judgment and its grant of partial summary judgment in favor of the Osmond Lane Homeowners Association. Additionally, Landrith appeals the trial court's grant of the Association's motion for a directed verdict on several of his defenses. We affirm.

BACKGROUND

¶2    In 1977, a Declaration of Protective Covenants (the Declaration) was recorded against all lots in the George Osmond Estates Subdivision (the Subdivision) in Provo, Utah. The Declaration contemplated the organization at a future date of the "George Osmond Estates Council," a nonprofit corporation that would be authorized pursuant to the Declaration "to provide certain facilities and services" to the Subdivision, its inhabitants, and its visitors.[1]

---

1.  Section 6.2 of the Declaration authorizes the Council to levy general maintenance assessments to promote "the health, safety, and welfare of the [Subdivision] residents" and to improve and maintain the common area. In particular, these assessments may be used to pay for taxes and insurance; for "general maintenance, repair, replacement, and additions" to the common area; and for "the cost of labor, equipment, materials, management, and supervision" related to maintenance of the common area, but no assessments may ever be used for capital improvements unless approved by a vote of two-thirds of Council members.

Section 6.4 of the Declaration reiterates that the Council may levy special assessments for capital improvements to the common area, in addition to the Council's authority to collect general maintenance assessments under Section 6.2. Such special assessments are intended to "defray[], in whole or in part, the cost of any construction or reconstruction, unexpected repair or replacement of any capital improvements upon the Common Area, . . . *provided that* any [special] assessment shall have the assent of two-thirds" of Council members. (Emphasis in original.)

Section 6.11 of the Declaration empowers the Council to "provide exterior maintenance upon each Parcel which is subject to assessment," including the authority to "paint, repair, replace and care for roofs, gutters, downspouts, exterior building surfaces, trees, shrubs, grass[,] walks, and other exterior improvements." The Council's authorization to provide exterior maintenance,

(continued...)

No entity by the name of the "George Osmond Estates Council" was ever organized.

¶3      In 1979, an unincorporated nonprofit association called the "Osmond Lane Homeowners Association" (the Association) commenced acting as the governing body in the Subdivision, conducting neighborhood meetings, resolving community concerns, collecting dues and assessments,[2] maintaining common areas, and paying common expenses. Although the Association's governance was somewhat different from the contemplated "George Osmond Estates Council" (the Council), the Association conducts regular meetings and elects a president and a board of directors from among the Subdivision property owners. However, while the Declaration contemplated two semi-annual payments from Subdivision property owners to the Council for "annual assessments," the Association requires annual assessments to be paid in full once yearly. Moreover, the Association collects unpaid homeowner association fees by filing mechanics' liens rather than the "continuing lien[s]" contemplated by the Declaration.

---

1. (...continued)
however, is tempered by Section 3.3 of the Declaration, which cautions that

> no . . . fence, wall, or other improvements that are not already located on such property shall be constructed, erected or maintained, nor shall any additions thereto, or alteration therein, be made until plans and specifications . . . shall have been submitted to and approved by the [George Osmond Estates Architectural and Planning Control] Board in writing.

2. Indeed, in a September 2002 district court action, the Association was recognized as the appropriate entity to collect annual dues in the Subdivision.

¶4      In 1992, Landrith purchased a home (the Property), which is located within the Subdivision. From the time of purchase until he sold the Property in 2007, Landrith paid annual dues to the Association to cover his share of the common expenses within the Subdivision.

¶5      At some point during Landrith's first two years in the home, an irrigation pipe froze and broke, causing water to flood the backyard and ultimately erode a hole at the Property's rear border, which runs along the top of a deep ravine. Over the next ten years, multiple sprinkler breaks and leaks permitted water to further erode the area, thus increasing the size of the hole. Beginning in 1998, the Association repeatedly requested that Landrith address the erosion in the southeast corner of the Property by "filling the hole with dirt." Landrith believed that the eroded area was merely an element of the ravine's rough terrain and, therefore, he refused to comply with the Association's request that he fill the hole.

¶6      In 2003, the Association sent Landrith a letter, expressing concern about the hole on the Property and reminding him of the Association's repeated requests over the previous five years that he remedy the eroded area. During that same year, Landrith vacated the Property; moved to Bountiful, Utah; and, apparently, left the Property unattended. After moving, Landrith notified Nevan Anderson, then president of the Association, of his intention to sell the Property. Still in 2003, Landrith and Anderson engaged in discussions regarding the erosion and the hole, with Anderson stressing that the problem had to be fixed.

¶7      Finally, in June 2004, Anderson informed Landrith that the hole on the Property needed to be fixed within two months. A month later, when Anderson and Landrith met with an independent contractor to discuss potential solutions for the eroded area, Anderson told Landrith that Landrith's belated plan of "filling [the hole] with dirt was no longer acceptable." Days later, Landrith listed the Property for sale "as is" with a real estate agent. In

August 2004, Anderson advised Landrith that a permit and engineering services would be necessary to fix the eroded area, and in November 2004, Anderson contacted and contracted with Earthtec, an engineering firm, to remedy the erosion issues.

¶8     Over time, the Property's soil beneath a set of concrete stairs and an existing railroad tie retaining wall at the rear of the Property had eroded to the point that the Association and neighbors became concerned with the safety of the area for children, the structural integrity of a neighbor's adjacent retaining wall, and the value of surrounding properties. Based on these concerns and without Landrith's knowledge or consent, the Association paid Earthtec in excess of $32,000 to construct two retaining walls along the southeast corner of the Property.

¶9     According to Earthtec's studies, the soil conditions on the Property would be subject to continued erosion, and therefore, Earthtec submitted plans to the Association for the construction of an interlocking block retaining wall system and corresponding drainage system. The Association never actually approved, in writing, the plans provided by Earthtec. Nevertheless, Earthtec retained CKR Engineers to design plans for the retaining walls, and the Association retained Interlock Paving to construct the walls as called for in the Earthtec plans. The construction involved extensive work on the Property, including the erecting of a ramp along the side of the Property to permit heavy construction equipment to access the rear portion of the Property. Following the construction of the interlocking block walls, the Association paid Earthtec, CKR Engineers, and Interlock Paving for their services, and then billed Landrith for reimbursement of the more than $32,000 cost.[3] Landrith did not pay the bill or even respond to the Association's invoice.

---

3. In addition to sending Landrith an invoice upon final completion of the retaining walls, the Association had previously sent Landrith an invoice for the partial completion of the retaining walls.

¶10 Subsequently, in January 2006, the Association filed a Notice of Lien against the Property for expenses incurred in constructing the walls and claiming an intent to "hold and claim a lien pursuant to the Declaration." The Association later filed a complaint in district court, seeking to foreclose on the Property. Landrith filed a motion for summary judgment, arguing that the Association was not authorized to act under the Declaration. The court denied Landrith's motion, stating that Landrith had ratified the Association's authority to act in the stead of the Council.

¶11 Thereafter, the Association filed its own motion for summary judgment with respect to the issue of whether it was authorized to act as the Council under the Declaration. The court granted the Association's motion for partial summary judgment, again stating that Landrith ratified the Association's authority to act with the authority initially envisioned for the Council.

¶12 The litigation ultimately culminated in a jury trial. At trial, Landrith tried to present evidence through the use of an expert witness to show the existence of much less expensive alternatives to an interlocking block retaining wall system. The Association, however, objected to the testimony of Landrith's expert on grounds of relevance and qualification under rule 702 of the Utah Rules of Evidence. The court granted the Association's objection on both grounds.

¶13 At the conclusion of trial, the Association moved for a directed verdict as to Landrith's defenses that the Association failed to mitigate its damages, materially breached the Declaration, waived its right to recover the cost of the walls from Landrith, and breached the implied covenant of good faith and fair dealing. The trial court granted the Association's motion as to all four of Landrith's defenses. Subsequently, the jury returned a verdict in favor of the Association, awarding it more than $33,000 in damages. Additionally, the Association was awarded prejudgment interest and attorney fees. Landrith appeals.

ISSUES AND STANDARDS OF REVIEW

¶14    Landrith's appeal focuses on two principal issues. He argues that the trial court erred in denying his motion for summary judgment and in granting the Association's competing motion for summary judgment regarding whether the Association was authorized to act as the Council pursuant to the Declaration. "We review the district court's decision to grant summary judgment for correctness, granting no deference to the [district] court." *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122 (alteration in original) (citation and internal quotation marks omitted). "[S]ummary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id*. (citation and internal quotation marks omitted). *See* Utah R. Civ. P. 56(c).

¶15    Landrith also claims that the trial court erred by granting the Association's motion for directed verdict as to Landrith's various defenses. "We review a trial court's grant of directed verdict for correctness. For a directed verdict to be appropriate, the evidence must be such that reasonable minds could not differ on the facts based on the evidence presented at trial." *Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 10, 104 P.3d 1185 (citations omitted).

ANALYSIS

I. Summary Judgment

¶16    We agree with the Association that the trial court did not err in denying Landrith's motion for summary judgment and in granting the Association's competing motion for partial summary judgment. On appeal, both parties addressed the Utah Supreme Court's decision in *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122. We are unpersuaded by Landrith's attempts to distinguish *Swan Creek* from the case before us.

¶17   In *Swan Creek*, after a development's original homeowners association was dissolved for its failure to file an annual report and pay the corresponding filing fee, a new homeowners association was incorporated and began to act. *See id*. ¶¶ 2–5. An individual who acquired property in the development subsequent to the formation of the new homeowners association refused to pay a special assessment levied by the new homeowners association, which, in turn, brought suit against the property owner to collect the assessment. *See id*. ¶¶ 6–11. The Utah Supreme Court stated that "[w]here property owners have treated an association as one with authority to govern and impose assessments contemplated under the terms of a duly recorded governing declaration, they ratify its authority to act." *Id*. ¶ 32. In reaching its decision, the Supreme Court relied on the facts that the new homeowners association had acted as such for twenty years, in which time no competing association emerged; lot owners collectively accepted the new homeowners association's management and paid dues to it; the new homeowners association's authority to collect assessments was upheld in a prior court action; and the new homeowners association's articles of incorporation and governing declaration were on file for years before the new owner acquired the property. *See id*. ¶ 38. Based on those facts, the Court exercised its "equitable power to hold that the [new homeowners association] possesses the authority delegated to the homeowners association by the [d]eclaration." *Id*. ¶ 39.

¶18   Here, we see no error in the trial court's analysis of, and application of the facts at hand to the rule set forth in, *Swan Creek*. First, it is undisputed that Subdivision property owners have regarded the Association as having "authority to govern and impose assessments contemplated under the terms of [the Declaration]." *See id*. ¶ 32. It is also undisputed that property owners in the Subdivision, including Landrith, have consistently paid dues to the Association. Landrith himself has repeatedly paid annual fees, special fees, and assessments for repairs and maintenance undertaken by the Association. Moreover, the Association has been operating and has undertaken property management responsibili-

ties pursuant to the terms of the Declaration for some thirty years. In that time, no competing association has emerged and the Association has been judicially recognized as authorized to levy assessments. Finally, the Declaration under which the Association purported to act was recorded many years prior to Landrith acquiring property in the Subdivision. We conclude that these facts, in particular the "pattern of acquiescence by the lot owners," place this case squarely within the reasoning articulated in *Swan Creek. See id.* ¶ 39. Thus, we see no error in the trial court's decision, and we "exercise our equitable power to hold that the [Association] possesses the authority delegated to the [Council] by the Declaration." *See id*. Therefore, as to the trial court's decision granting the Association summary judgment with respect to whether it had authority to act as the Council pursuant to the Declaration, we affirm.

## II. Directed Verdict

¶19   Having determined that the Association could properly exercise the powers granted to the Council by the Declaration, we next turn to the Declaration itself. Specifically, we address Landrith's argument that the Association materially breached the Declaration and, on that basis in particular, that the trial court erred in granting the Association's motion for directed verdict. We begin by emphasizing that the Association is a creature of contract, empowered as a governing body of homeowners to serve the Subdivision through powers specifically enumerated in the Declaration. Such powers, however, are qualified and restricted by the Declaration's provisions and limitations. Thus, the Declaration entitles the Association to freely make repairs and undertake exterior maintenance even to individually owned units, but restricts the authority to undertake capital improvements to the common area. It is undisputed that the retaining walls were constructed on Landrith's property, not the common area. Thus, the provisions authorizing the Association to undertake capital

improvements are not applicable.[4] Accordingly, we focus on the Association's authority to undertake projects that qualify as repairs or maintenance.

¶20    The Association is authorized to conduct exterior maintenance on individual units and the common area, with the costs being recouped through the assessment process.[5] Thus, Landrith is entirely correct that if construction of the retaining walls was not an act of repair or maintenance, the Association lacked the authority to have them built.

¶21    Consideration of the Declaration's provisions, several of which are summarized in footnote 1 of this opinion, convinces us that the decision of whether to classify the Association's construction of new retaining walls as a repair or maintenance is, as Landrith insists, a question that properly should have gone to the jury. Section 6.11 states that "[i]n addition to maintenance upon the Common Area, the Council may provide exterior maintenance upon each Parcel which is subject to assessment . . . as follows: paint, repair, replace and care for roofs, gutters, downspouts, exterior building surfaces, trees, shrubs, grass[,] walks, *and other exterior improvements*." (Emphasis added.)

¶22    As noted, the Association may justify its actions in constructing retaining walls on Landrith's property only if they

---

4. It follows that there was no error in the trial court's rejection of Landrith's proposed jury instruction defining "capital improvement."

5. Section 6.11 of the Declaration states that "[i]n addition to maintenance upon the Common Area, the Council may provide exterior maintenance upon each Parcel[.]" Moreover, Section 6.12 explains that "[t]he cost of such exterior maintenance shall be assessed against the Parcel upon which such maintenance is done and shall be added to and become a part of the annual assessment[.]"

constitute a "repair" or "other exterior improvements" under Section 6.11. Landrith argues that the installation of new interlocking block retaining walls goes beyond the definition of a "repair." *See Webster's Third New Int'l Dictionary* 1923 (1993) (defining "repair" as "to restore by replacing a part or putting together what is torn or broken"). But the question remains whether construction of the retaining walls falls under "other exterior improvements" as that term is used in Section 6.11. The term "other exterior improvements" in Section 6.11 is, seemingly, a catchall phrase for any other maintenance the Association may provide, in addition to "paint, repair, replace and care for roofs, gutters, downspouts, exterior building surfaces, trees, shrubs, grass[, and] walks."[6] As with statutory construction, words in a contract must "be interpreted according to their plain meaning unless the context justifies a different interpretation." *State v. Serpente*, 768 P.2d 994, 997 (Utah. Ct. App. 1989). The words "other exterior maintenance" are

> not subject to a plain meaning, but rather must [be interpreted] from the context in which [they] appear[]. To this end, we resort to the doctrine of ejusdem generis. This doctrine provides that "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated."

*Id*. (quoting *Black's Law Dictionary* 464 (5th ed. 1979)).

¶23    Landrith argues that the construction of retaining walls, which required the use of heavy equipment, multiple workers, and substantial expense, is not maintenance of the same caliber and quality as such things as painting or caring for trees and

---

6. We see no error in the trial court's refusal to instruct the jury on the meaning of "repair," "improvement," and "replace." These are common terms well within the understanding of typical jurors.

shrubs—simple tasks that may typically be accomplished by one worker with hand tools. But Section 6.11 is not limited to such minor work. The references in Section 6.11 to roof repair and, indeed, roof replacement suggest that not all acts of repair or maintenance will be as minor as Landrith contends. Thus, a jury question was properly presented as to whether the Association's actions qualified as exterior maintenance under Section 6.11. Landrith concedes as much, of course, in arguing that the directed verdict was not in order. We agree with Landrith that a question for the jury was presented, but we disagree that the jury's consideration of his theory was foreclosed by the trial court's directed verdict. Careful consideration of the record demonstrates that this issue was presented to and decided by the jury notwithstanding the partial directed verdict.

¶24 At the close of evidence, the trial court granted the Association's motion for directed verdict on several issues. One aspect of the trial court's ruling precluded Landrith from arguing that the Association's replacement of an inadequate retaining wall on his property with two new retaining walls constituted a capital improvement in violation of the Declaration. As indicated previously, this ruling was proper because the walls were constructed on Landrith's property, not on the common area, making the capital improvement provisions inapplicable. The directed verdict, however, did *not* preclude the jury from considering whether the retaining wall project constituted exterior maintenance authorized under Section 6.11. To the contrary, the trial court expressly allowed Landrith to argue that the Association's actions did *not* constitute exterior maintenance:

> [LANDRITH'S COUNSEL]: Have you ruled that this is general maintenance, or can I argue that that's not—this is not general maintenance?
>
> THE COURT: Well, you can argue that he didn't breach, and you can argue, I guess, that this is not general maintenance.

[LANDRITH'S COUNSEL]: Thank you.

[THE ASSOCIATION'S COUNSEL]: But it's not capital improvements. He can't argue that.

THE COURT: It's not capital improvements.

¶25    The parties then proceeded to make closing arguments, during which both Landrith's and the Association's counsel argued their respective positions on whether the Association's actions were permissible as exterior maintenance under Section 6.11. The Association's counsel referred the jury to Section 6.11 and argued that Section 6.11 "lists a bunch of things. The ones that truly apply in our case are repair and replace a whole bunch of things, including exterior improvements. You remember, there's a number of pictures that show the old retaining wall. What are we doing but replacing retaining walls?"

¶26    In his closing argument, Landrith's counsel specifically asked the jury to "circle [Section] 6.11, take a look at it, because that's the deal that you'll be looking at," and then argued that the Association's actions were not authorized as exterior maintenance under Section 6.11. Landrith's counsel urged the jury to find that construction of the new retaining walls did not constitute exterior maintenance because of the size of the "two huge walls," and distinguished the scope of the Association's project from the other items listed in Section 6.11. At the conclusion of his closing argument, Landrith's counsel again invoked Section 6.11 as controlling the jury's award of damages:

> [S]hould you have to pay that? Well, what was the agreement that you made? Go back and take a look at [Section] 6.11, and I ask you—I think it's the right thing to do. . . .
>
> Before you enter a single dollar in [the Association's] favor, make sure you've read [Section]

6.11 and agree that what they did was part of the deal that was made between Mr. Landrith and the [Association]. It was not. It's not even close. This kind of thing, you just can't have somebody coming onto your property and building something like this without your permission and consent under the guise of maintenance, and turning around and billing you $32,800.

¶27 The case went to the jury with a Special Verdict form containing five questions. In answering the third and fourth questions,[7] the jury found unanimously that "[the] Association was entitled to provide exterior maintenance upon the George Landrith, Jr. lot as follows: paint, repair, replace and care for roofs, gutters, down spouts, exterior building surfaces, trees, shrubs, grass[,] walks, and other exterior improvements" and that "[the] Association repaired the damage caused by erosion . . . by contracting with various entities to replace the railroad tie retaining wall with new retaining walls." The fifth question asked the amount of damages to be awarded, which the jury answered in the exact amount claimed by the Association, $33,143.62. Thus, in a Special Verdict patterned nearly word for word on Section 6.11, the jury found that the Association "was entitled to provide exterior maintenance upon the [Landrith] lot," including "repair[ing and] replac[ing] . . . exterior improvements"; that it had "repaired the damage caused by erosion . . . [by] replac[ing] the railroad tie retaining wall with new retaining walls"; and that it was therefore entitled to damages in the amount expended on the project.

---

7. The first two Special Verdict questions asked whether property owners belonging to the Association had a duty to maintain their property in good repair and whether Landrith had breached the Declaration. The jury unanimously answered these two questions in the affirmative.

¶28    In sum, Landrith was entitled to have this question presented to and resolved by the jury. And notwithstanding the partial directed verdict, it was—albeit in a manner adverse to his position.[8]

### III. Other Issues

¶29    Landrith raises a number of other issues in this appeal. First, he challenges the trial court's exclusion of his proposed expert witness. This decision is reviewed deferentially, under an abuse of discretion standard. *See, e.g., State v. Brink*, 2007 UT App 353, ¶ 4, 173 P.3d 183. We see no such abuse of discretion here. While Landrith's intended witness was in the business of constructing stone walls, he was not an engineer and conceded that his company typically needed the help of an engineer to design the walls it builds. And he did not visit the property until after the new walls were in place and, thus, never saw the conditions that confronted the Association and its contractors. *See* Utah R. Evid. 702(b)(2) (requiring that expert opinions be "based upon sufficient facts or data"). Finally, he had no experience with interlocking block walls, as were at issue in this case. Accordingly, we discern no error in the trial court's performance of its role as "gatekeeper" in excluding the proposed expert's testimony. *See generally Gunn Hill Dairy*

---

8. Other aspects of the trial court's directed verdict are more easily resolved. The evidence was clear that, largely because he vacated the property, Landrith had not taken reasonable steps to mitigate his damages by prudently dealing with the erosion problem. Insofar as he contended that there were more economical ways for the Association to have dealt with the problem, his case rested on the testimony of his expert, which was excluded as hereafter explained. Further, any breaches by the Association of certain requirements concerning plan approval, notice to Landrith, approval of the assessment to fund construction of the walls, and the absence of an authorizing resolution for the construction were not so material as to excuse Landrith's liability for his breaches.

*Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 16, 269 P.3d 980 ("'The trial court has wide discretion in determining the admissibility of expert testimony,' and we will disturb a court's exclusion of expert testimony only when it 'exceeds the limits of reasonability.'") (quoting *Eskelson v. Davis Hosp.*, 2010 UT 59, ¶ 5, 242 P.3d 762).

¶30 Second, Landrith complains about the trial court's calculation of prejudgment interest. He has not persuaded us, however, that there was any significant error in this regard, and the position of the Association—that any error was actually in Landrith's favor—seems entirely plausible given the terms of Section 6.8 of the Declaration, which establishes and defines a delinquency interest rate.

¶31 Third, Landrith questions the amount of costs awarded. Under the broad terms of rule 54(d), we are not persuaded that the court erred in assessing the costs it did. *See* Utah R. Civ. P. 54(d)(1) (providing that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs").

¶32 Fourth, Landrith challenges the amount of attorney fees awarded to the Association as the prevailing party.[9] We see no error with the award of fees under the principles explained in *Dixie State Bank v. Bracken*, 764 P.2d 985 (Utah 1988).

## IV. Fees on Appeal

¶33 The Association requests an award of its fees incurred on appeal, and it does so in a manner compliant with our rule 24. *See* Utah R. App. P. 24(a)(9) ("A party seeking to recover attorney's fees incurred on appeal shall state the request explicitly and set

---

9. Anticipating success on appeal, Landrith hoped to be characterized as the prevailing party and sought an award of his fees on this basis. Landrith did not prevail, below or on appeal, and thus is not entitled to an award of his attorney fees.

forth the legal basis for such an award."). A party who is awarded fees below and prevails on appeal is entitled to recover its attorney fees reasonably incurred on appeal. *See Management Servs. Corp. v. Development Assocs.*, 617 P.2d 406, 409 (Utah 1980). That is the case here, and the Association is entitled to an award of the fees it reasonably incurred on appeal.

CONCLUSION

¶34     The trial court committed no error in denying Landrith's motion for summary judgment and granting the Association's motion for summary judgment related to the Association's authority to act in the stead of the Council pursuant to the Declaration. It was a question for the jury whether the Association's actions in constructing a retaining wall system on Landrith's property was a repair or other act of exterior maintenance under the Declaration. Contrary to Landrith's argument, the jury's consideration of this issue was not foreclosed by the directed verdict, and the jury, properly instructed, decided the issue in the Association's favor.

¶35     We see no abuse of discretion in the trial court's exclusion of Landrith's proposed expert witness. We are not convinced there was error in the trial court's award of prejudgment interest, taxable costs, or attorney fees. And the Association is entitled to an award of the fees it reasonably incurred on appeal.

¶36     The verdict and ensuing judgment are affirmed. We remand for determination of an appropriate award of the attorney fees incurred by the Association on appeal.

———————