2007 UT App 223

**WASATCH OIL & GAS, L.L.C., a Utah limited liability company, Plaintiff and Appellant,**

v.

**Edward A. REOTT, et al., Defendants and Appellees.**

**Goal, L.L.C., a Utah limited liability company; and Regoal, Inc., a Pennsylvania corporation, Counterclaim, Third-party, and Crossclaim Plaintiffs; and Appellees,**

v.

**Wasatch Oil & Gas, L.L.C., et al., Counterclaim, Third-party, and Crossclaim Defendants; and Appellants.**

No. 20060562–CA.

Court of Appeals of Utah.

June 21, 2007.

Eric C. Olson and Matthew K. Richards, Salt Lake City, Nick Sampinos, Price, and Carolyn L. McIntosh, Denver, Colorado, for Appellant.

Gary E. Doctorman, Lawrence E. Stevens, and Dianna M. Gibson, Salt Lake City, for Appellees.

Before Judges BILLINGS, DAVIS, and THORNE.

OPINION (For Official Publication)

BILLINGS, Judge:

¶1 Plaintiff Wasatch Oil & Gas, L.L.C. (Wasatch) appeals the trial court's grant of partial summary judgment to Defendant Ed-

ward A. Reott (Reott).[1] On appeal, Wasatch argues the trial court erred in concluding (1) that Reott had standing to challenge whether Wasatch was a lawful successor in interest, entitled to exercise redemption rights, and (2) that Wasatch was not a valid successor in interest because it had no legal or equitable title to the disputed property. We reverse the trial court's grant of partial summary judgment and remand for further proceedings.

## BACKGROUND [2]

¶ 2 From approximately 1997 to 2000, Mission Energy, L.L.C. (Mission) was a Colorado limited liability company engaged in oil and gas business on federal and state land in Carbon and Duchesne Counties, Utah. Mission was governed by the Mission Operating Agreement (the MOA). According to the MOA, "[t]he right to operate the LLC shall be vested in the [m]anagers, acting by majority vote ... [and a]t all times during the term of the LLC, there shall be at least four [m]anagers." The MOA requires that the identity of Mission's managers be disclosed in a schedule attached to the MOA. At the time of the MOA's execution in April 1997, the schedule attached to the MOA listed four managers: Fred G. Jager, William F. Muller, Charles B. Willard, and Justin C. Sutton. From 1997 to 2000, Sutton purportedly acted as Mission's sole manager. Sutton officially resigned as manager on October 1, 2000, and Jager acted as manager following Sutton's resignation.

¶ 3 In 1997, Mission was the record title owner of two mineral leasehold interests (ML 43541 & ML 43798), issued by the Utah School and Institutional Trust Lands Administration (SITLA), in Section 32, Township 12 South, Range 16 East (Section 32). These two leases collectively covered the entire 640 acres of Section 32. In 1997, Mission was also the owner of the Lavinia State # 1–32 well (the Well), located on forty acres wholly within Section 32 with a specified depth of 3398 feet.[3]

¶ 4 In February 1997, the Estate of Lavinia Reott made a bridge loan to Mission in the amount of $160,000.[4] Mission promised to repay the loan within three months. Mission did not repay the loan, and in May 1998, Reott filed suit against Mission in federal court to recover the unpaid loan. In December 1999, Reott obtained a judgment against Mission in the amount of $204,000, plus costs and post-judgment interest.

¶ 5 From February 1998 through May 2000, eleven mechanics' liens were recorded against Mission's Section 32 interests due to Mission's failure to pay for goods and services provided. Two companies, J–West Oilfield Services, Inc. (J–West) and Key Energy Services, Inc. (Key Energy), filed lawsuits against Mission to foreclose on their mechanics' liens and, ultimately, obtained judgments and orders of foreclosure against Mission.

¶ 6 On June 21, 2000, Mission and Wasatch executed a letter agreement (the Agreement) that provided for, among other things, the transfer of Mission's mineral lease rights (ML 43541 & ML 43798) in Section 32 to Wasatch.[5] The Agreement assigned Wasatch all record title and working interest to the Section 32 leases, "except for the wellbore rights and attributable spacing unit relating to ... the [Well]." Thus, under the Agreement, Mission retained the Well, including the Well's corresponding mineral lease rights. In return, Wasatch agreed to assume the obligation to maintain the leases it received, reimburse Mission for monies

---

1. For ease of reference, the term "Wasatch" includes Wasatch Oil & Gas Production Corp. and Wasatch Gas Gathering, L.L.C. Similarly, the term "Reott" also collectively includes Reott's companies, Goal, L.L.C. and Regoal, Inc.

2. "[W]hen an appellate court reviews a district court's grant of summary judgment, 'the facts and all reasonable inferences drawn therefrom [are viewed] in the light most favorable to the nonmoving party.'" *Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312 (second alteration in original) (quoting *Fericks v. Lucy Ann Soffe Trust*, 2004 UT 85, ¶ 2, 100 P.3d 1200).

3. References to the Well include the forty acres on which it is located.

4. Lavinia Reott was Reott's mother.

5. The Agreement also provided for the transfer of Federal Bureau of Land Management (BLM) leases not at issue here.

Mission had paid in rental payments on certain leases, and provide Mission with "a right to participate in a 'trade' relating to a drilling deal that Wasatch may be successful in putting together on the [l]eases." The Agreement was never recorded, and Wasatch did not end up putting together the drilling deal.

¶ 7 On June 23, 2000, Sutton executed three mineral lease assignment forms (the Assignments) purporting to transfer all of Mission's Section 32 leasehold rights. Specifically, the Assignments, signed by Sutton on the line designated for "Lessee–Assignor," assign the assignor's/lessee's rights to ML 43541 and ML 43798 to Wasatch. The Assignments do not expressly identify Sutton as the manager of Mission or as a person authorized to execute the Assignments on Mission's behalf. On the back of the Assignments, Wasatch agrees to "hereby accept[ ] the assignment from Mission."

¶ 8 The MOA gives managers the authority to "execute on behalf of [Mission] without obligation on third party's part for inquiry as to actual authority or as to disposition of funds, all contracts, leases, notes, mortgages, deeds, evidences of indebtedness or security agreements" and to "enter into any and all other agreements on behalf of [Mission], with any other person or entity for any purpose." The MOA states, however, that

> [a]ny document or instrument, of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind [Mission] or convey or encumber title to its real or personal property shall be valid and binding for all purposes if executed by any two of the [m]anagers.

¶ 9 Following the Assignments, Mission retained only the Well. Although Wasatch admits it knew about Mission's debts to Key Energy and J–West prior to the issuance of the Assignments, Wasatch thought the J–West and Key Energy mechanics' liens only attached to the Well.

¶ 10 The Assignments were not recorded with the Carbon County Recorder. On July 5, 2000, SITLA approved the Assignments. On August 22, 2000, Mission sent a letter to Wasatch stating:

> I was informed that you, or your offices had been contacted by several individuals, specifically ... Reott, regarding potential filings of judgment against Mission.... There are several creditors with outstanding issues.... I must request that you advise your offices to refer any similar[ ] creditor, or legal calls directly to my attention. Further[,] given the confidentiality of the agreements entered into between our companies, I would request that no verbal, or written information be sent to anyone without prior permission from Mission.... [6]

Wasatch claims that this letter ratifies the Assignments, signed by Sutton, and that "[t]he letter evidences that Mission was not a stranger to the deal and that Sutton did not act ultra vires or on his own behalf but as Mission's manager, when [he] effected the transfers to Wasatch." (Emphasis omitted.) On August 22, 2000, Sutton also wrote Reott, stating, among other things, that:

> [T]he managers of Mission ... are doing everything possible to protect the assets of the company. We are working with several companies to develop a drilling program in hopes of receiving revenues to pay off creditors of the company. In that regard, many of those creditors who are owed monies for operations and permitting that have not been paid are working with Mission to try and make the company successful.

¶ 11 On October 27, 2000, Reott domesticated the Colorado judgment against Mission in Utah state court. In 2001, Reott purchased J–West's and Key Energy's judgment interests and liens against Mission. Subsequently, on May 16, 2001, Reott sought enforcement of all judgments against Mission's Section 32 interests.

---

6. "I" assumably refers to Sutton, although the letter in the record on appeal provides no signature to confirm this.

¶ 12 A sheriff's sale was held on August 9, 2001. No other bidders appeared at the sale and Reott obtained a certificate of sale for Mission's Section 32 interests for a credit bid of $1.00.[7] In December 2001, Wasatch, after learning of the sale, filed a redemption notice, tendered a check in the amount of $1.06, and brought suit to quiet title to certain lease rights on Section 32 (Section 32 Leasehold Interests).[8] In response, Reott rejected the tender and filed a notice that "Wasatch Is Not a Proper Party to Redeem or That The Amount of Redemption Is Insufficient." On January 10, 2002, the Carbon County Sheriff's Office sent a letter to Wasatch, certifying receipt of the redemption notice and stating that the sheriff's office was unable to locate Mission, Reott, Key Energy, or J–West in Carbon County. The sheriff returned Wasatch's tendered check. On January 18, 2002, Wasatch filed a second redemption notice and tender of redemption amount.[9] On February 9, 2002, the sheriff issued the deed to Reott, and Reott subsequently recorded it. Reott later filed a lis pendens against the disputed property. On April 30, 2002, Wasatch sold a number of leases to Bill Barrett Corp. (BBC), including its Section 32 Leasehold Interests. BBC recorded its Section 32 Leasehold Interests. Reott added BBC as a defendant in late 2002.

¶ 13 On April 15, 2004, Wasatch moved for partial summary judgment, arguing that it was entitled to and had properly exercised a valid right of redemption. Reott submitted a memorandum in opposition to Wasatch's motion and filed his own motion for partial summary judgment against Wasatch and BBC as to issues of quiet title, fraudulent conveyance, trespass, conversion, and trespass to chattels. Reott claimed that Wasatch could not exercise a right of redemption because (1) Wasatch did not have legal title on grounds that the Assignments failed to identify Sutton as an agent for Mission and Wasatch did not pay sufficient consideration and (2) Wasatch did not have "equitable title on the basis of fraudulent conveyance." Reott also argued that if Wasatch was not a lawful successor in interest to Mission, BBC was liable for trespass, conversion, and trespass of chattels as to the Section 32 Leasehold Interests. Wasatch and BBC each filed opposing memoranda to Reott's motion.

¶ 14 The parties argued their motions for partial summary judgment in early 2005. On December 16, 2005, the trial court denied Wasatch's motion with respect to redemption rights in the Section 32 Leasehold Interests[10] and granted Reott's motion. The trial court concluded that there were no disputed material facts, and Reott was entitled to judgment as a matter of law with regard to issues of quiet title and fraudulent conveyance. Specifically, the trial court determined that (1) Reott had standing to challenge Wasatch's purported redemption rights and (2) Wasatch was not a successor in interest, entitled to redemption, because the Assignments did not transfer legal title to the Section 32 Leasehold Interests to Wasatch due to "the failure to identify Sutton on the assignment forms as a person authorized to execute the [A]ssignments on behalf of Mission," and the Agreement did not convey equitable title to Wasatch because Mission fraudulently transferred its Section 32 Leasehold Interests to Wasatch. In making its decision, the trial court ruled that "Reott's lien interests in the [s]heriff's [s]ale properties are extinguished because the sale on a judgment exhausts it as to the property sold."

¶ 15 The trial court therefore quieted title to the Section 32 Leasehold Interests in Reott as of February 9, 2002, ruling that "neither ... [Wasatch] or BBC have any record, legal[,] or equitable interest in or title to such property." The trial court also granted Reott's motion against BBC as to

---

7. Along with Mission's interest in other sections not relevant here.

8. Wasatch's suit also sought to quiet title to BLM leases not at issue here.

9. Wasatch filed both notices within the six-month period required under former Utah Rule of Civil Procedure 69(j), the governing rule effective at the time. See Utah R. Civ. P. 69(j) (repealed 2004).

10. The trial court granted Wasatch's motion with respect to the federal BLM leases that, as previously noted, are not at issue on appeal.

issues of trespass, trespass to chattels, and conversion.

¶ 16 Wasatch appeals the trial court's grant of Reott's motion for partial summary judgment.

## ISSUE AND STANDARD OF REVIEW

¶ 17 On appeal, Wasatch claims the trial court erred in granting Reott's motion for partial summary judgment, quieting title to the Section 32 Leasehold Interests in Reott. "A court appropriately grants summary judgment 'only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 12, 140 P.3d 1210 (quoting *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122); *see also* Utah R. Civ. P. 56(c). Thus, "[w]e review the district court's grant of partial summary judgment 'for correctness, granting no deference to the district court.'" *Id.* (quoting *Swan Creek*, 2006 UT 22 at ¶ 16, 134 P.3d 1122).

## ANALYSIS

¶ 18 Wasatch argues the trial court improperly granted Reott's motion for partial summary judgment. Specifically, Wasatch claims the trial court erred in determining (1) that Reott had standing to challenge whether Wasatch was a lawful successor in interest to the Section 32 Leasehold Interests and (2) that Wasatch was not a lawful successor in interest to Mission, entitled to redemption rights, because it had no legal or equitable title in the Section 32 Leasehold Interests.

## I. Standing

¶ 19 Wasatch first claims that the trial court improperly granted Reott's motion for partial summary judgment because Reott did not have standing to challenge Wasatch's right to redeem its alleged Section 32 Leasehold Interests. In Utah, a party has standing if he or she suffers "'some distinct and palpable injury that gives rise to a personal stake in the outcome of the dispute.'" *D.A.R. v. State*, 2006 UT App 114, ¶ 7, 133 P.3d 445 (quoting *Berg v. State*, 2004 UT App 337, ¶ 8, 100 P.3d 261).[11]

¶ 20 The Utah Rules of Civil Procedure govern the exercise of redemption rights. In 2000, at which time Wasatch attempted to exercise its purported redemption rights, the governing provision was former rule 69(j).[12] Under rule 69(j),

> [r]eal property sold subject to redemption, or any part sold separately, may be redeemed by the following persons or their successors in interest: (A) the judgment debtor; (B) a creditor having a lien by judgment, mortgage, or other lien on the property sold, or on some share or part

---

11. Whether a complainant has suffered a "distinct and palpable injury," giving "rise to a personal stake in the ... dispute," is one means of satisfying Utah's three-tier standing inquiry. *D.A.R. v. State*, 2006 UT App 114, ¶ 7, 133 P.3d 445 (citing *State v. Mace*, 921 P.2d 1372, 1379 (Utah 1996)). That is, "'[i]f the complainant cannot [show that he will suffer a distinct and palpable injury], then [the court] will move to the second step of determining whether anyone else would have a more direct interest in the issues who can more adequately litigate the issues.'" *Id.* (third alteration in original) (quoting *Mace*, 921 P.2d at 1379). And, "if the complainant cannot meet the first or second steps of [the] inquiry, then the court will 'move to the third step, which is to decide if the issues raised by the [complainant] are of sufficient public importance in and of themselves to grant ... standing.'" *Id.* (second and third alterations in original) (quoting *Mace*, 921 P.2d at 1379). Here, Reott and Wasatch focus solely on whether Reott suffered a distinct and palpable injury.

12. Utah Rule of Civil Procedure 69(j) was repealed in 2004 and replaced by current rule 69C. Rule 69C(b) provides that

> [r]eal property subject to redemption may be redeemed by the defendant or by a creditor having a lien on the property junior to that on which the property was sold or by their successors in interest. If the defendant redeems, the effect of the sale is terminated and the defendant is restored to the defendant's estate. If the property is redeemed by a creditor, any other creditor having a right of redemption may redeem.

Utah R. Civ. P. 69C(b). Although rule 69C(b) and former rule 69(j) are substantively similar, the parties and the lower court refer to and rely on rule 69(j), the rule in place at the time Wasatch attempted to redeem. For purposes of our analysis, we do the same.

thereof, subsequent to that on which the property was sold.

Utah R. Civ. P. 69(j)(1) (repealed 2004).

¶ 21 The parties do not dispute that Reott relinquished his judgment creditor status respecting the Section 32 Leasehold Interests when he purchased those interests, and Utah case law appears to acknowledge such relinquishment. For example, in *Brockbank v. Brockbank*, 2001 UT App 251, 32 P.3d 990, this court held that a judgment creditor who foreclosed and subsequently purchased liened property owned the purchased property, "subject only to the exercise of the right of redemption," and that this right of redemption was not available to the foreclosing creditor turned purchaser, i.e., "she could not execute on it." *Id.* at ¶ 12. The court explained that "[t]o allow a foreclosing creditor to control the right of redemption is inconsistent with the purpose of that right—to provide a check on bids that are well below market value." *Id.; see also id.* at n. 3 (citing cases for the proposition that liens are not revived by redemption and that " '[t]he principle purpose of the redemption statute, and the only purpose which it serves in a superior way, is the encouragement of adequate bidding at the sale[, and o]bviously this purpose is defeated by holding that liens are revived, or that a deficiency decree will effectively charge the land' " (citations omitted) ). *See also Currier v. Elliott*, 141 Ind. 394, 39 N.E. 554, 557–58 (1895) (" 'A purchaser at an execution sale stands in no sort of legal privity of contract with the creditor upon whose claim the judgment was obtained. It does not alter the case that the purchaser and the creditor are the same person. In respect to the property purchased they can[n]ot be the same. The creditors ceased to be creditors [respecting the property] when the sale occurred. Thenceforward their interest in the property was as purchasers at an execution sale, not as creditors.' " (citation omitted) ).

¶ 22 Thus, as a purchaser, "[Reott] owned the [Section 32 Leasehold Interests], subject only to the exercise of the right of redemption" by Mission, or its alleged successor in interest, Wasatch. *Brockbank*, 2001 UT App 251 at ¶ 12, 32 P.3d 990. Wasatch argues

that because Reott's ownership of the Section 32 Leasehold Interests was subject only to Wasatch's exercise of its redemption rights, Reott would suffer no injury if Wasatch redeemed because Reott would be reimbursed his credit bid plus cost. The fact that Reott's reimbursement would only be $1.06 of his $238,000 lien is, Wasatch claims, no fault but his own. That is, because "the high bid at the sheriff's sale sets the redemption amount, which is the only amount guaranteed to the creditor for the [redemption period;] . . . this is the risk a creditor takes when bidding less than market value." *Id.* at ¶ 14. Because "[t]he amount bid . . . is within the creditor's control," *id.*, Wasatch contends that any injury to Reott is self-inflicted and results from Reott's own choice to set a nominal bid amount, not from Wasatch's exercise of its redemption rights.

¶ 23 Although we agree with Wasatch that Reott "is bound by [his] choices" and "should not now be heard to complain" about his decision to set the redemption value at $1.00, *Tech–Fluid Servs., Inc. v. Gavilan Operating, Inc.*, 787 P.2d 1328, 1335 (Utah Ct.App.1990), we conclude that Wasatch mischaracterizes Reott's alleged injury. "Utah case law has long recognized substantive rights vesting in those who purchase property at sheriff[s'] sales." *American Interstate Mortgage Corp. v. Edwards*, 2002 UT App 16, ¶ 25, 41 P.3d 1142; *see also Huston v. Lewis*, 818 P.2d 531, 535 (Utah 1991); *Layton v. Layton*, 105 Utah 1, 140 P.2d 759, 762 (1943) (" 'A sale by the sheriff gives the purchaser, under a certificate, an inchoate right to the land, if not an interest in the land itself; and it is such a right as will ripen into a title unless the property be redeemed from him.' " (citation omitted) ). Thus, because Reott's ownership interest is subject only to Wasatch's redemption rights, if Wasatch, as Reott alleges, is not legally entitled to such redemption rights, Reott will be unlawfully usurped of his ownership rights. In other words, it is this unlawful usurpation, and not the nominal redemption amount, that Reott claims gives rise to injury sufficient to give him standing to challenge Wasatch's redemption rights. Just as a "purchaser at a sheriff's sale [has the substantive right] to

receive the proper redemption amount in accordance with [the rules] or to have the title perfected," *Huston,* 818 P.2d at 535, we think a purchaser likewise has the right to ensure that redemption is only exercised by those entitled to it under the rules. *See Reynolds v. Davis,* 78 Mont. 56, 252 P. 386, 387 (1926) (holding that sheriff sale purchaser was "the actual owner of the property, subject only to the right of redemption" and "[a]s owner he was entitled to protect his interest and to contest the right of [the redemptioner] to redeem"); *Leland v. Heiberg,* 156 Minn. 30, 194 N.W. 93, 94 (1923) ("The purchaser at a foreclosure sale has the right to acquire absolute title unless redemption is made by one entitled to redeem, and hence he may question a judgment creditor's right to redeem by attacking the judgment."); *Robertson v. Moline, Milburn & Stoddard Co.,* 88 Iowa 463, 55 N.W. 495, 496 (1893) ("When the appellant purchased [property] at [a] sale on execution, he took it subject only to redemption from the sale by the persons and in the manner authorized by statute. If those entitled to redeem failed to do so within the time and in the manner provided, the [property] became his absolutely. He might surely question the right of one not authorized to redeem to do so, and ask that an attempted redemption be set aside as a cloud upon his title."); *see also United States Fed. Credit Union v. Avidigm Capital Group, Inc.,* No. 06–4448, 2007 WL 737796, at *2, 2007 U.S. Dist. LEXIS 20652, at *6 (D.Minn. Mar. 8, 2007) (noting that purchaser could have contested right of redemption). As one court has noted, "[i]f the law [were] otherwise, anybody and everybody might redeem, without the purchaser being able to question their right to do so." *Hughes v. Olson,* 74 Minn. 237, 77 N.W. 42, 42 (1898) ("[A] purchaser at a mortgage sale ... has the right to acquire absolute title to the land, unless it is redeemed within the time allowed by law by one who has a right under the statute to redeem; and he cannot be deprived of this right by one who is not a lawful redemptioner.").

¶ 24 Furthermore, we point out that in *Brockbank,* this court noted that the judgment creditor turned purchaser could not object to an assignee's right of redemption because the purchaser "waived her objections when she accepted the [redemption] tender." 2001 UT App 251 at ¶ 16, 32 P.3d 990. Here, the parties do not dispute, and the record is clear that, unlike the purchaser in *Brockbank, see id.,* Reott did not accept the redemption amount tendered by Wasatch.

¶ 25 In sum, we conclude that as a sheriff's sale purchaser, Reott had standing to question whether Wasatch was a lawful successor in interest, entitled to exercise redemption rights. Given this conclusion, we next address Wasatch's claim that the trial court erred in concluding as a matter of law that Wasatch was not a lawful successor in interest because it did not have legal or equitable title to the Section 32 Leasehold Interests.

## II. Legal Title

¶ 26 We first consider whether the trial court erred in deciding that Wasatch was not a lawful successor in interest because it lacked legal title to the Section 32 Leasehold Interests. The trial court concluded that Wasatch did not have legal title because the Assignments failed to identify Sutton as a person authorized to execute assignments on Mission's behalf.

¶ 27 We disagree with the trial court's conclusion that the Assignments' failure to identify Sutton as an agent precluded legal title from passing as a matter of law. "It is well established in the law that a principal is liable for the acts of his agent within the scope of the agent's authority, irrespective of whether the principal is disclosed or undisclosed." *Garland v. Fleischmann,* 831 P.2d 107, 110 (Utah 1992). "The fact that an agent acts in his own name without disclosing [the] principal does not preclude liability on the part of the principal...." *Id.* This is true even when an agent signs a written agreement for the transfer of real property without disclosing his or her agency status. *See id.* at 108, 110–11 (holding that buyers who entered into an earnest money agreement for the sale of land from sellers, who failed to disclose their agency status, "could look to [the principal corporation] for a deed when [the agent sellers] failed to provide one" and explaining that parol evidence is admissible to establish

agency); *see also id.* at 110 (citing *Nalbandian v. Hanson Rest. & Lounge, Inc.*, 369 Mass. 150, 338 N.E.2d 335 (1975) (granting specific performance against a corporation for sale of real estate even though the corporation president had signed the sale agreement without indicating he was acting on behalf of the corporation that owned the property) ). Thus, we hold the trial court erred in concluding that the Assignments' failure to identify Sutton as an agent of Mission barred legal title from passing as a matter of law.

¶ 28 But we point out that in Utah,

No estate or interest in real property ... shall be created, granted, assigned, surrendered[,] or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering[,] or declaring the same, or by his lawful agent thereunto authorized by writing.

Utah Code Ann. § 25–5–1 (1998). The requirement that an agent signing on behalf of another party is authorized in writing to do so "[n]aturally ... appli[es] to agents of corporations." *Mathis v. Madsen,* 1 Utah 2d 46, 261 P.2d 952, 956 (1953). Although courts "have adopted an exception [to this written authorization requirement for corporate agents] when the person who acts under an oral authorization is either a general agent or executive officer of the corporation." *Id.*

¶ 29 It is undisputed that the MOA gives Mission managers, such as Sutton, the authority to "execute on behalf of [Mission] without obligation on a third party's part for inquiry as to actual authority or as to disposition of funds, all contracts, leases, notes, mortgages, deeds, evidences of indebtedness or security agreements" and to "enter into any and all other agreements on behalf of [Mission], with any other person or entity for any purpose." But it is also undisputed that the MOA requires that

[a]ny document or instrument, of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage, deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind [Mission] or convey or encumber title to its real or personal property *shall be valid and binding for all purposes if executed by any two of the [m]anagers.*

Thus, although the MOA gives Sutton the general power to act on behalf of and under the authorization of Mission in the assignment of its property, the MOA limits this power in that it explicitly requires two Mission managers to execute instruments conveying Mission's title to real property, such as the Assignments. The parties agree that Sutton was the only manager who executed the Assignments. Therefore, we conclude that Sutton, acting alone, did not have the requisite written authority to assign the Section 32 Leasehold Interests.

¶ 30 What is not clear from the record on appeal, however, is whether Sutton had oral authorization from Mission to assign the Section 32 Leasehold Interests. *See Mathis,* 261 P.2d at 956 (noting that general agents or executive officers of corporations need only show oral authorization to satisfy the statute of frauds' agent authorization requirement). Nor is it clear whether Mission later ratified the Assignments. *See Bradshaw v. McBride,* 649 P.2d 74, 78 (Utah 1982) (explaining that a principal may subsequently ratify unauthorized agent acts).[13] We therefore reverse the trial court's grant of summary judgment as to the issue of legal title and remand to the trial court to determine whether Mission gave Sutton oral authorization to execute the Assignments or whether Mission subsequently ratified the Assignments; and, if so, the effect thereof.

### III. Equitable Title

¶ 31 We likewise reverse and remand the trial court's grant of summary judgment on

---

13. Under Utah law, "[a] principal may impliedly or expressly ratify an agreement made by an unauthorized agent." *Bradshaw v. McBride,* 649 P.2d 74, 78 (Utah 1982). "However, a ratification requires the principal to have knowledge of all material facts and an intent to ratify." *Id.*

"[T]he same kind of authorization that is required to clothe an agent initially with authority to contract must be given by the principal to constitute a ratification of an unauthorized act." *Id.* at 79.

the issue of equitable title. The trial court determined that Wasatch did not have equitable title to the Section 32 Leasehold Interests because Mission fraudulently transferred those interests. Wasatch contends that the trial court erred in concluding fraudulent transfer occurred as a matter of law because, although the facts supporting the various badges of fraud are not disputed, the parties heavily contest the inferences one could draw from those facts, and, in weighing those inferences, the trial court essentially engaged in improper fact finding. We agree.

¶ 32 Under the Utah Fraudulent Transfer Act (UFTA), the transfer of an asset "is fraudulent ... if the debtor made the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor." Utah Code Ann. § 25–6–5(1)(a) (1998). In deciding whether fraudulent intent exists, it is appropriate to infer its existence from "certain indicia of fraud," among other factors, set forth in the UFTA, *see id.* § 25–6–5(2)(a)–(k). *Territorial Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 462 (Utah Ct.App.1989). These indicia have been described as so called "badges of fraud." *Selvage v. J.J. Johnson & Assocs.,* 910 P.2d 1252, 1261 (Utah Ct.App.1996) (quotations omitted).

¶ 33 The badges' "'value as evidence,'" however, "'is relative not absolute,'" and they are considered "facts which 'throw suspicion on a transaction and which call for an explanation.'" *Id.* at 1262 (quoting *Territorial Sav.,* 781 P.2d at 462). In other words, "They are not usually conclusive proof; they are open to explanation. They may be almost conclusive, or they may furnish merely a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case." *Territorial Sav.,* 781 P.2d at 462 (quotations and citations omitted). Importantly, "[t]he existence of fraudulent intent is a factual question," which "necessarily involves weighing the evidence presented and assessing the credibility of witnesses—tasks largely within the province of the fact-finder." *Selvage,* 910 P.2d at 1262.

¶ 34 Here, the trial court adopted, with little explanation, Reott's eleven asserted badges of fraud as conclusive evidence of fraudulent intent. While we agree with the parties that many of the underlying facts are undisputed, it was improper on summary judgment for the trial court to weigh these facts and adopt Reott's legal conclusion that these facts necessarily infer fraudulent intent.

¶ 35 For example, the trial court adopted Reott's alleged badge of fraud that "Sutton and [Wasatch] carved up [one of the leases] with the intent of evading the liens and judgments." While Wasatch does not dispute that it carved up the lease, Wasatch strongly contests Reott's asserted inference that such carving was done with the intent to evade liens and judgments. In fact, Wasatch asserts that it assumed the liens and judgments only applied to the Well. The trial court's decision to adopt Reott's legal conclusion as to the significance of the carving was wholly improper. On summary judgment, "[t]he trial court must not weigh evidence or assess credibility," *Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles, Chartered,* 681 P.2d 1258, 1261 (Utah 1984), and where "there are other equally plausible inferences to be drawn from the evidence ... summary judgment should not have been granted," *Ellsworth Paulsen Constr. Co. v. 51–SPR, L.L.C.,* 2006 UT App 353, ¶ 18, 144 P.3d 261. Moreover, on summary judgment, the trial court was required to construe "[d]oubts, uncertainties, or inferences concerning issues of fact ... in a light most favorable to the party opposing summary judgment," which in this case was Wasatch, not Reott. *Mountain States,* 681 P.2d at 1261.

¶ 36 We therefore reverse the trial court's determination of fraudulent intent and remand for "the fact-finder [to] consider" whether the undisputed facts support an inference of fraudulent intent. *Selvage,* 910 P.2d at 1261 (explaining that the badges of fraud are "factors which the fact-finder may consider, among others, to determine if actual intent [to defraud] existed" (quotations omitted)).

## CONCLUSION

¶ 37 In sum, we conclude that as sheriff's sale purchaser of the Section 32 Leasehold

Interests, Reott had standing, generally speaking, to challenge whether Wasatch was a lawful successor in interest capable of exercising a right of redemption. Nonetheless, we determine the trial court erred in deciding as a matter of law that Wasatch lacked legal or equitable title, precluding lawful successor in interest status, to the Section 32 Leasehold Interests. We therefore reverse the trial court's grant of partial summary judgment quieting title in Reott and remand for further proceedings consistent with this opinion.[14]

¶ 38 WE CONCUR: JAMES Z. DAVIS and WILLIAM A. THORNE JR., Judges.

---

**14.** Although BBC does not expressly appeal the trial court rulings regarding trespass, conversion, and trespass to chattels, these rulings were based on the trial court's determination that Reott had title to the Section 32 Leasehold Interests.