**2023 UT 7**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

HI-COUNTRY ESTATES HOMEOWNERS ASSOCIATION, PHASE II,
*Appellee,*

*v.*

ROBBIE FRANK, AS TRUSTEE OF HIGH CANYON RD 20 TRUST, DATED
MAY 27, 2009, AND HIGH CANYON RD 15 TRUST, DATED MAY 27,
2009,
*Appellant.*

No. 20200689
Heard February 9, 2022
Filed May 4, 2023

On Direct Appeal

Third District Court, Salt Lake County
The Honorable Patrick W. Corum
No. 129914525

Attorneys:
Jeffrey L. Silvestrini, Stephen T. Hester, Bradley M. Strassberg,
Salt Lake City, for appellee

Troy L. Booher, Beth E. Kennedy, Taylor P. Webb, Salt Lake City,
Landon A. Allred, South Jordan, Bruce R. Baird, Salt Lake City,
for appellant

JUSTICE PETERSEN authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUDGE
MORTENSEN, and JUDGE TENNEY joined.

Due to their retirements, JUSTICE HIMONAS and JUSTICE LEE did not
participate herein; COURT OF APPEALS JUDGE DAVID N. MORTENSEN
and COURT OF APPEALS JUDGE RYAN D. TENNEY sat.

JUSTICE HAGEN became a member of the Court on May 18, 2022,
after oral argument in this matter, and accordingly did not
participate.

JUSTICE POHLMAN became a member of the Court on August 17,
2022, after oral argument in this matter, and accordingly did not
participate.

---

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1 In this appeal, we must determine whether a homeowners association has the authority to assess property within its boundaries, despite alleged defects in the association's founding documents. The Hi-Country Estates Homeowners Association, Phase II (HOA) brought a lawsuit to collect unpaid assessments against Robbie Frank, the trustee of two trusts that each own a lot within the HOA's boundaries (Lots).[1] The HOA was formed in 1973. And since at least 1979, prior owners of the Lots have paid the HOA's annual assessments. But when Frank purchased the Lots on behalf of the trusts in 2009, he refused to pay the assessments. He argues here that the HOA has no authority to assess the Lots because the person who signed the HOA's founding documents approximately fifty years ago did not actually own most of the property he included within the HOA's boundaries, including the Lots. Frank contends that this renders the founding documents void and the HOA powerless.

¶2 Both the HOA and Frank moved for summary judgment in the district court. And the district court sided with the HOA. Relying in large part on our reasoning in *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122, the district court concluded that the HOA had authority to assess the Lots, even assuming there were problems with its founding documents, because the members of the HOA had subsequently ratified the HOA's authority over the years. On this basis, the court partially granted the HOA's motion, concluding that the HOA was entitled to collect the past due assessments, but that a bench trial would be necessary to determine the amount owing.

¶3 Frank appeals. He argues that the district court erred because the documents establishing the HOA are void as against public policy, and void documents cannot be ratified. In the alternative, he argues that the court incorrectly determined that ratification had occurred here.

¶4 We affirm the district court. We have concluded in another case involving the same HOA and the same governing

---

[1] When we refer to Frank throughout this opinion, we refer to him in his capacity as the trustee of the trusts.

documents that the documents are merely voidable, not absolutely void. *WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, ¶ 46, 515 P.3d 432. And voidable documents are subject to ratification. That holding applies here. And we conclude that the district court correctly determined that the members of the HOA have collectively ratified the HOA's authority. Therefore, we agree that the HOA has authority to assess the Lots. And we affirm the district court's determination of the amount owing.

## BACKGROUND[2]

### *The HOA and Its Governing Documents*

¶5   In 1973, a man named Charles Lewton signed and recorded protective covenants and a certificate of incorporation for "Hi-Country Estates, Phase II." The documents established the HOA and included within its boundaries approximately 2,000 acres of land near Herriman, Utah. The Lots were included within the boundaries of the HOA at its inception as lots 170-A and 171.

¶6   The 1973 protective covenants stated that the "owners of the herein described property, hereby subject said property to the following covenants, restrictions and conditions." Among other things, the covenants provided that each lot owner would be a member of the HOA and would "pay annually his pro-rata share of the cost to maintain the roads, streets and common areas."

¶7   The HOA's governing documents have been revised and amended over the years. The current governing documents are the Certificate of Incorporation and Addendum to Certificate of Incorporation; the Second Revised Protective Covenants, including subsequent amendments, dated December 10, 1980 (1980 Protective Covenants); and the First Revised—1988 By-Laws, including subsequent amendments (1988 By-Laws) (together, governing documents). All of the original and current governing documents were duly recorded with the Salt Lake County Recorder.

¶8   The 1980 Protective Covenants were signed by the President, Vice President, and Director of the HOA, purportedly "in response to the wishes of the majority of Association Members

_____

[2] These facts are drawn primarily from the district court's recitation of undisputed material facts in its summary judgment order.

during the Annual Membership Meeting on July 6, 1980." Like the original protective covenants, the 1980 Protective Covenants stated that a homeowners association would be established, that each lot owner would be a member of the association, and that each lot owner would pay a pro-rata share of the assessments.

¶9   The 1988 By-Laws were enacted at an annual meeting of HOA members. "The By-Laws, like the Covenants, provide[d] for the obligation of lot owners to pay assessments, [and] the ability of the HOA to collect such assessments . . . ."

¶10  From at least 1979 to the present, the HOA has held regular meetings and elections, disseminated communications and reports to its members, provided various services for the members, collected yearly assessments from the members, and "otherwise acted as a homeowner association" with respect to the property within its boundaries. No competing association has emerged.

¶11  There are currently hundreds of HOA members. And most members have paid their assessments to the HOA.

¶12  The HOA has assessed the Lots since 1979. And previous owners of the Lots have duly paid these assessments.

*The Lots*

¶13  In 2009, two trusts purchased the Lots.[3] Appellant Robbie Frank is the trustee of both trusts. The governing documents had long been of record by the time of this purchase, providing notice that each lot owner within the HOA's boundaries is a member of the HOA and must pay annual assessments. However, from the time the trusts purchased the Lots, Frank has refused to pay the assessments levied by the HOA.

¶14  Yet, Frank has participated and voted in HOA meetings on behalf of the trusts. He has also acknowledged that the property is within the HOA boundaries and that, consequently, the trusts are members of the HOA.

---

[3] The trusts are High Canyon Rd 15 Trust and High Canyon Rd 20 Trust.

*The HOA's Lawsuit to Collect Unpaid Assessments*

¶15  In 2012, the HOA sued the trusts to obtain the past-due assessments. The HOA's complaint did not progress for reasons that are not clear from the record.

¶16  Meanwhile, in 2015, other lot owners who were involved in separate litigation against the HOA claimed that they had discovered evidence showing that when Charles Lewton established the HOA and signed the governing documents in 1973, he owned less than 1 percent of the property he included in the HOA's boundaries. Frank alleges that the acreage Charles Lewton owned did not include the Lots.[4]

¶17  This information led to a lawsuit in 2016, in which a group of property owners referred to collectively as "WDIS" filed a quiet title action against the HOA. WDIS moved for a declaration that the governing documents signed by Charles Lewton were void *ab initio* (from the beginning), because it violated public policy for Lewton to encumber property that he did not own. *WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, ¶ 9, 515 P.3d 432.

¶18  The same year, the HOA filed a new complaint against Frank on behalf of the trusts. Frank answered the HOA's complaint and included a defense that "[t]he alleged HOA's claims are barred, in whole or in part, because the HOA does not legally exist as alleged in the [WDIS Litigation] and thus has no right to make any assessments and never has."

*Frank's Motion to Amend*

¶19  The district court consolidated the HOA's 2012 and 2016 complaints against Frank. The following year, the HOA moved for summary judgment, which Frank opposed. The day after briefing closed on the summary judgment motion, Frank moved for leave to amend his answer to the HOA's 2016 complaint. He sought to add counterclaims for quiet title and wrongful lien.

¶20  After hearing both motions, the district court denied the HOA's motion for summary judgment, concluding that the HOA had failed to meet its burden of proof. The district court also

_____

[4] The district court did not make any findings of fact related to Charles Lewton's ownership, or lack thereof, of the property he included in the HOA.

denied Frank leave to amend, concluding, among other things, that the motion was untimely.

*Cross Motions for Summary Judgment*

¶21 Subsequently, the HOA filed a second motion for summary judgment. This motion argued that the district court should determine as a matter of law that Frank owed the HOA unpaid assessments pursuant to the Utah Community Association Act and the HOA's governing documents. It included declarations from the HOA director and manager regarding the amount due.

¶22 Frank filed a competing motion for summary judgment, which challenged the HOA's authority to assess the Lots. Among other things, he asserted that the HOA's governing documents were invalid because Charles Lewton had not owned most of the property he had included within the HOA's boundaries, and no owner of the Lots had signed the governing documents.

¶23 The district court denied Frank's motion and granted partial summary judgment in favor of the HOA. The court determined that, even assuming the HOA's founding documents were faulty, the HOA still had authority to assess the Lots because the members of the HOA had subsequently ratified the HOA's authority:

> Because the HOA's Articles of Incorporation and Covenants were of record when Defendants took ownership of Lots 170-A and 171, because decades have passed since the time those documents were recorded, because the members of the HOA have since acted as though the HOA was a legitimate governing entity for decades and because no competing entity has arisen, the Court rules that the HOA's ability to govern and make assessments against the [L]ots within its purported jurisdiction has been ratified by its members.

¶24 The district court also noted that Frank himself had recognized the authority of the HOA. The court found that Frank had "on multiple occasions" acknowledged that the Lots were inside the HOA's boundaries, having "repeatedly admitted this fact when voting on [their behalf], and ha[ving] repeatedly recognized the validity of the HOA and enforceability of its governing documents." The court further noted that assessments on the Lots had been dutifully paid to the HOA prior to Frank's purchase on behalf of the trusts.

¶25 Ultimately, the district court relied upon *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122, and its progeny, *Osmond Lane Homeowners Ass'n v. Landrith*, 2013 UT App 20, 295 P.3d 704, to conclude that the members of the HOA had ratified the HOA's authority to assess lots within its boundaries, even if there were deficiencies with one or more of the HOA's governing documents. The court explained,

> The fact that the HOA has been existing, living and breathing as a homeowner association for 40 years, conducting meetings and elections, governing the [L]ots at issue, making, collecting and enforcing assessments for decades, making improvements, creating committees—all with decades of cooperation of and participation from its members—means that the authority to act as such has been ratified by its members as a matter of law.

¶26 Although the district court determined that the HOA had authority to assess the Lots and that the trusts owed unpaid assessments, it did not rely upon the declaration submitted by the HOA to determine the specific amount owing. Rather, it decided that "out of an abundance of caution," it needed further verification of the amount past due.

*Frank's Motion to Reconsider*

¶27 Frank then moved the district court to reconsider its summary judgment order. Relevant here, he reiterated his claim that the people who signed the governing documents in 1973 and 1980 did not own all of the land they purported to encumber. And he argued that this rendered the governing documents absolutely void as against public policy and, therefore, incapable of ratification. He argued in the alternative that, even assuming the covenants were voidable rather than absolutely void, the trusts did not have "the necessary knowledge or intent" to ratify them and that ratification could have occurred only through a signed writing by an owner of the Lots. The court denied that motion as well.

*The Bench Trial to Calculate Unpaid Assessments*

¶28 The district court then held a bench trial to determine the amount of the unpaid assessments. Shortly before trial, the HOA disclosed two witnesses in its pretrial disclosures: Ryan Bonham, the HOA manager; and Sheila Adler, the HOA president, whom the HOA designated as its corporate representative. Frank argued

that these disclosures were untimely. But the district court denied Frank's objection and allowed the witnesses to testify. And the court awarded the HOA the total of the unpaid assessments the HOA had proven at the bench trial.

¶29 Frank appeals. He argues that the district court erred in granting partial summary judgment to the HOA because the governing documents are absolutely void and therefore incapable of ratification. He argues in the alternative that even if the documents are merely voidable, the court incorrectly concluded that ratification had occurred here because the governing documents are subject to the Statute of Frauds and can be ratified only through a signed writing by the owner of the property at issue. Frank further argues that the court should have excluded the HOA's witnesses at the bench trial on damages because they were not disclosed in a timely manner. And finally, Frank argues that the court erred in denying his motion for leave to amend his complaint.

¶30 We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶31 We review a district court's "grant or denial of summary judgment for correctness," viewing "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (cleaned up).

¶32 "We review a district court's decision on sanctions under rule 26(d)(4) [of the Utah Rules of Civil Procedure] . . . for an abuse of discretion." *Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 12, 445 P.3d 434.

¶33 And we review a district court's grant or denial of a motion to amend for an abuse of discretion. *Bresee v. Barton*, 2016 UT App 220, ¶ 14, 387 P.3d 536.

## ANALYSIS

¶34 We first address Frank's argument that the HOA has no authority to assess the Lots because the governing documents that established the HOA are absolutely void and, therefore, cannot be ratified. The district court did not make factual findings with respect to whether Lewton owned the land he included in the HOA. However, even assuming Frank's allegations are correct, it would not make the governing documents absolutely void. In

another case involving the same HOA, we determined that Lewton's lack of ownership would render the governing documents merely voidable. *WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, ¶ 52, 515 P.3d 432. That holding applies here, and the HOA's authority is therefore capable of ratification.

¶35  We then address Frank's challenges to the district court's determination that the members of the HOA ratified the HOA's authority. We determine that the principles underlying *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122, should be extended to the circumstances here. And we conclude that the district court correctly applied those principles to these facts.

¶36 Next, we consider Frank's argument that the district court should not have admitted the HOA's witnesses at the bench trial to determine the amount of unpaid assessments, and therefore the HOA has no evidence of the amount it is owed. We conclude that the court acted within its discretion.

¶37 And finally, we analyze Frank's argument that the district court abused its discretion when it denied Frank's motion for leave to amend his complaint. While the court could have chosen to grant Frank leave to amend, we conclude that it did not abuse its discretion in deciding not to do so.

## I. THE GOVERNING DOCUMENTS ARE VOIDABLE, NOT ABSOLUTELY VOID

¶38  Frank argues that the HOA has no authority to assess the Lots because its governing documents are absolutely void and incapable of ratification. The HOA's main response is that Frank did not preserve this argument. We conclude the issue was preserved, but we reject Frank's argument on the merits.

¶39  The HOA argues that Frank did not preserve his voidness argument in his motion for summary judgment because he did not use the terms "void" or "voidable," or argue that the HOA's documents violated public policy. "In order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Salt Lake City v. Josephson*, 2019 UT 6, ¶ 12, 435 P.3d 255 (cleaned up).

¶40 Frank partially presented the issue to the district court when he argued in his motion for summary judgment that the HOA's governing documents were unenforceable. Frank concedes

that he did not specifically argue that the documents were "void." However, the factual premise of his argument that the documents were unenforceable is similar to the factual premise of his voidness argument on appeal: the signers of the governing documents in 1973 and 1980 did not own the property they purported to encumber, including the Lots. But rather than arguing in his motion for summary judgment that this made the documents void as a matter of public policy, he argued that it rendered them unenforceable under the Statute of Frauds, the Wrongful Lien Act, and "standard principles of contract law."

¶41 Although Frank did not make a fully formed voidness argument in his motion for summary judgment, he did make such an argument in his motion for reconsideration. And the district court chose to address the argument, stating, "the fact remains that I [already] found ratification based on what was in front of me and I . . . stand by that. So the Motion to Reconsider is denied."

¶42 Where a party includes an issue in a motion to reconsider and the district court chooses to address it, the issue is preserved. *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 50, 345 P.3d 531 ("[T]rial courts are under no obligation to consider motions for reconsideration. That being said, if a trial court decides, in its discretion, to address the merits of a claim raised for the first time in a motion to reconsider, that claim is preserved." (cleaned up)). Accordingly, we reject the HOA's assertion that Frank did not preserve his voidness argument.

¶43 However, we have rejected the same argument on the merits in another case involving the same HOA, the same governing documents, and substantially the same argument. *See WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, 515 P.3d 432. And that case is controlling here.

¶44 In *WDIS II*, we held with respect to the same governing documents that "restrictive covenants that are recorded without the signature of the affected landowner are voidable, not absolutely void, and they are therefore ratifiable." *Id.* ¶ 52. In that case, the plaintiffs were various persons and entities that owned property within the HOA. *Id.* ¶ 3 n.2. They made the same claim that Frank makes here—that although Charles Lewton signed the governing documents, he did not own most of the land he included in the HOA's boundaries. *Id.* ¶ 5. They sought to quiet title to their properties, and moved for a declaration that the

HOA's governing documents were absolutely void. *Id.* ¶ 9. We explained,

> [T]he distinction between void and voidable is important because a contract or a deed that is void cannot be ratified or accepted, and anyone can attack its validity in court. In contrast, a contract or deed that is voidable may be ratified at the election of the injured party. Once ratified, the voidable contract or deed is deemed valid.

*Id.* ¶ 14 (cleaned up) (quoting *Ockey v. Lehmer*, 2008 UT 37, ¶¶ 15, 18, 189 P.3d 51).

¶45 We observed that we "start with the presumption that contracts are voidable unless they clearly violate public policy." *Id.* ¶ 15 (cleaned up) (quoting *Ockey*, 2008 UT 37, ¶ 21). And to overcome this presumption, a party's showing that the documents violate public policy must be "free from doubt." *Id.* To make such a determination, we ask "(1) whether the law or legal precedent has declared that the type of contract at issue is unlawful and absolutely void, and (2) whether the contract harmed the public as a whole—not just an individual." *Id.* ¶ 21 (cleaned up) (quoting *Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶ 24, 469 P.3d 1035)).

¶46 Like Frank, the landowners in *WDIS II* argued that the governing documents were void because they violate public policy as expressed in the Statute of Frauds, the Wrongful Lien Act, and appellate caselaw. *See id.* ¶ 23. But we rejected this argument and concluded that the landowners had not overcome the presumption that the governing documents were merely voidable. *Id.* ¶¶ 2, 13. Accordingly, we held that "restrictive covenants that are recorded without the signature of the affected landowner are voidable, not absolutely void, and they are therefore ratifiable." *Id.* ¶ 52. And this holding applies here.

¶47 As we noted in *WDIS II*, the result of this holding is judicial deference to the HOA members' collective decision to either reject or ratify the HOA's authority, rather than a judicial determination that the members cannot ratify the HOA's authority as a matter of law. *Id.* ¶¶ 16–22. And under these circumstances, where covenants have existed for decades, the reliance interests of the hundreds of other owners in the HOA "may be especially substantial." *Id.* ¶ 19.

¶48 Since we have determined that the governing documents are only voidable, we proceed to analyze whether the district court correctly concluded that the HOA's members have collectively ratified the HOA's authority to assess property within its boundaries.

## II. THE HOA MEMBERS HAVE RATIFIED THE HOA'S AUTHORITY

¶49 The district court concluded that the residents within the HOA had collectively ratified the HOA's authority over time, including the HOA's authority to assess the Lots. Frank argues that this was error because the collective conduct the court relied upon does not constitute ratification under the circumstances here. Frank contends that because the governing documents encumber real property, the Statute of Frauds requires that any ratification must be in a writing, signed by the affected property owners, who must have known of the defect, and had an intent to subject the property to the governing documents despite the defect. And he argues that because there is no such writing in the record, the governing documents necessarily have not been ratified. We disagree.

¶50 As an initial matter, we clarify that the question in this case is whether the HOA's members have ratified the HOA's *authority* in general, and its *authority to assess* the property within its boundaries in particular. Frank's analysis focuses on whether the members have ratified the governing documents. It is correct that the HOA was originally established and empowered by those documents. But here, the question before us is whether the HOA had authority to levy annual assessments. Accordingly, the focus of our analysis is whether the HOA members have ratified the HOA's *authority*. We do not address whether the documents as a whole have been ratified, as that question is not presented here.

¶51 We addressed ratification of a homeowners association's authority in *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122. There, we held that "the HOA possesse[d] the authority to levy assessments on property in the Swan Creek subdivision because the lot owners *collectively ratified* its authority to act as the association contemplated by the Declaration." *Id.* ¶ 55 (emphasis added).

¶52 In *Swan Creek*, a developer incorporated a homeowners association to manage a development in Rich County and recorded with the county a "Declaration of Reservations, Restrictions and Covenants of Swan Creek Village (the

"Declaration")." *Id.* ¶ 2. But before the development was complete, the developer declared bankruptcy and abandoned the project. *Id.* ¶ 3. The homeowners association did not file the requisite annual report or pay its filing fee, and it was involuntarily dissolved. *Id.* To fill the void, an owner of a lot within the subdivision incorporated a new homeowners association "using the identical name and articles of incorporation used by the Original Association." *Id.* ¶ 4. He called a meeting of all lot owners. *Id.* "More than 100 people, representing almost half of the lot owners, attended the meeting and elected a board of directors for the [homeowners association]." *Id.*

¶53 Years later, a person bought a lot within the subdivision and refused to pay an assessment that the homeowners association had levied on the property. *Id.* ¶¶ 8–10. The homeowners association sued the owner. *Id.* ¶ 11. And the owner argued that the homeowners association had no right to levy the assessment "because [it was] not the association contemplated under the Declaration and because an insufficient number of lot owners voted to ratify its authority." *Id.* ¶ 30.

¶54 We rejected this argument and held that the homeowners association was valid and authorized to impose assessments pursuant to the Declaration. *Id.* ¶ 31. We explained that even though there appeared to be no record evidence that the Declaration had been formally amended to recognize the new homeowners association, and there were "disputed issues of fact with respect to whether a majority of the lot owners formally approved the substitution of the [new homeowners association]," those facts were immaterial in light of the lot owners' ratification. *Id.* ¶ 31. We reaffirmed that "[w]here property owners have treated an association as one with authority to govern and impose assessments contemplated under the terms of a duly recorded governing declaration, they ratify its authority to act." *Id.* ¶ 32.

¶55 In reaching that conclusion, we found relevant that the homeowners association "ha[d] acted as a valid association for almost twenty years, during which time the lot owners ha[d] collectively accepted its management"; the "lot owners ha[d] paid their dues to the [homeowners association]"; only 24 of the 538 lot owners had not paid the assessment at issue in the case; the [homeowners association] had managed the property within Swan Creek; the articles of incorporation and the Declaration had been on file for years before the defendant acquired the property; the [homeowners association] had been recognized as valid in

another court case, which imparted additional notice of the [homeowners association's] validity; there had been a "pattern of acquiescence by the lot owners"; and no competing association had emerged. *Id.* ¶¶ 38–39.

¶56   Here, in granting partial summary judgment to the HOA, the district court relied on our analysis in *Swan Creek* and its progeny. The district court noted that "the HOA's Articles of Incorporation and Covenants were of record when [the owner] took ownership of Lots 170-A and 171," "decades have passed since the time those documents were recorded," "the members of the HOA have since acted as though the HOA was a legitimate governing entity for decades," and "no competing entity has arisen."

¶57  The district court also found that Frank himself had acknowledged the authority of the HOA. It found that Frank had "on multiple occasions" acknowledged that the Lots were inside the HOA, having "repeatedly admitted this fact when voting on [their behalf], and ha[ving] repeatedly recognized the validity of the HOA and enforceability of its governing documents."

¶58   The court ultimately concluded,

> Utah law is clear that even if there was some technical deficiency with the HOA's governing documents, the fact that the HOA has been existing, living and breathing as a homeowner association for 40 years, conducting meetings and elections, governing the [L]ots at issue, making, collecting and enforcing assessments for decades, making improvements, creating committees—all with decades of cooperation of and participation from its members—means that the authority to act as such has been ratified by its members as a matter of law.

(Citing *Swan Creek*, 2006 UT 22, ¶¶ 30–39; *Osmond Lane Homeowners Ass'n v. Landrith*, 2013 UT App 20, ¶ 17, 295 P.3d 704.)

¶59  Frank challenges the district court's decision. He argues that because the governing documents "convey an interest in real property," the Statute of Frauds applies and therefore any ratification must be in a writing signed by an owner of the property. And he asserts that for ratification to occur, the writing must demonstrate an intent to ratify the defect. So he argues that any conduct on the part of any lot owner prior to 2015, when the discovery was made that Charles Lewton had not owned the

majority of the land within the HOA's boundaries, is insufficient as a matter of law to constitute ratification.

¶60 For these propositions, Frank relies upon *Bradshaw v. McBride*, 649 P.2d 74 (Utah 1982). But that case involved a different scenario and does not control here.

¶61 In *McBride*, a mother deeded a one-eighth undivided interest in the family farm to each of her eight adult children as tenants in common. *Id.* at 76. One daughter visited the owner of a neighboring property and discussed selling the farm to the neighbor. *Id.* The parties disputed whether the daughter had said that she was authorized to act on behalf of her siblings, with the neighbor claiming that the daughter assured her she had such authority, and the daughter claiming she had made clear that the sale was contingent on the subsequent approval of the other co-owners, her siblings. *Id.* The daughter and the neighbor orally agreed on a selling price, and the neighbor gave the daughter a $5,000 check. *Id.* The daughter did not inform all of her siblings about the agreement until after it was made. *Id.* And when the daughter had a real estate agent prepare warranty deeds for her siblings to sign, some of them refused to do so. *Id.* at 77.

¶62 The neighbor sued for specific performance of the oral agreement. *Id* at 76. The neighbor acknowledged "the general rule . . . that one who deals with an agent has the responsibility to ascertain the agent's authority despite the agent's representations." *Id.* at 78. But the neighbor argued that this should not be dispositive because the other co-owners had ratified the oral contract. *Id.* The district court agreed and "found ratification in the [siblings'] failure to come forward and repudiate or disaffirm [their sister's] agreement to sell the property or her authority to act for them." *Id.*

¶63 This court reversed. In doing so, we analyzed what constitutes a principal's ratification of an agreement made by an unauthorized agent. *Id.* We explained that "[a] principal may impliedly or expressly ratify an agreement made by an unauthorized agent." *Id.* Such a ratification "requires the principal to have knowledge of all material facts and an intent to ratify." *Id.* We explained that ratification "need not be express," and "[a]ny conduct which indicates assent by the purported principal to become a party to the transaction or which is justifiable only if there is ratification is sufficient." *Id.* However, we noted that under the circumstances, "there was no ratification as a matter of law because the Utah statute of frauds requires that any agent

executing an agreement conveying an interest in land on behalf of his principal must be authorized in writing." *Id.* (cleaned up).

¶64  It is this language that Frank relies upon to argue that any ratification here must have been in writing, and that those ratifying had to have known about all material facts (specifically, the alleged defect) and an intent to ratify despite the defect. But this is an expansion of *McBride* outside of its relevant context.

¶65  First, the analysis in *McBride* about the requirement of a writing was specific to the issue of agency presented in that case— specifically, whether the siblings (the principals) had ratified the act of their sister (the unauthorized agent). Because the agreement involved the sale of land and was subject to the Statute of Frauds, the *agent* was required to be "thereunto authorized in writing." *Id.* at 79 n.3 (quoting UTAH CODE § 25-5-3 (1953)) ("Every contract for . . . the sale[] of any lands . . . shall be void unless the contract . . . is in writing subscribed by the party by whom the . . . sale is to be made, *or by his lawful agent thereunto authorized in writing*." (emphasis added)). And we concluded that because the agent's authority had to be documented in a writing, any ratification of the agent's unauthorized act also had to be in writing. We explained,

> In order to enforce an oral agreement, *the same kind of authorization that is required to clothe an agent initially with authority to contract* must be given by the principal to constitute a ratification of an unauthorized act. Where the law requires the *authority* to be given in writing, the ratification must also generally be in writing.

*Id.* at 79 (emphasis added). Accordingly, we concluded that no ratification of the sister's oral agreement had occurred as a matter of law, because her siblings had not ratified their sister's unauthorized act in writing. *Id.* at 78–79.

¶66 Accordingly, *McBride* does not stand for the general proposition, as Frank contends, that "where the statute of frauds applies, ratification may occur only in [a] writing" that demonstrates an intent to ratify the defect. Rather, in that case we were analyzing a specific provision of the Statute of Frauds dealing with the authority of an agent, Utah Code section 25-5-3, which is not implicated here.

¶67 *Swan Creek* exemplifies that, even where real property is involved, we do not always require that ratification be evidenced

in a writing, or that the writing demonstrate an intent to ratify the relevant defect. In that case, we did not require a writing to show that the affected landowners had ratified the authority of the homeowners association. *Swan Creek*, 2006 UT 22, ¶¶ 30–39. And we did not ask whether the homeowners association members were aware of the defect in that case—specifically, that the HOA was not the one established in the Declaration, but a substitute homeowners association with the same name, which one lot owner had formed. Instead, we concluded that it was immaterial whether the Declaration had been formally amended to recognize the new homeowners association, or whether a majority of the lot owners formally approved the substitution of the new homeowners association for the original one. *Id.* ¶ 31. Rather, we concluded that ratification had occurred based on the repeated conduct of the homeowners association members over a period of time, which included treating the association as one with authority to govern and impose assessments, accepting its management, paying dues, and the overall "pattern of acquiescence by the lot owners." *Id.* ¶¶ 32, 38–39.

¶68 Frank argues that *Swan Creek* does not apply here. He notes that *Swan Creek* involved the ratification of a homeowners association that was operating pursuant to a "duly recorded" declaration. And he interprets this to mean that in that case, we held only that "once the land was already properly encumbered, the property owners' conduct could ratify a subsequent defect—the fact that a new HOA had replaced the originally authorized HOA to govern the duly encumbered lots."

¶69 We disagree with part of the distinction that Frank draws. "Duly recorded" means only that a document has been filed with an entity pursuant to law in a manner that gives notice of its contents and legal effect.[5] In the present context, it means

---

[5] While *Black's Law Dictionary* does not define the phrase "duly recorded," the definitions it provides for the constituent terms provide guidance. *Black's* defines "duly" as: "In a proper manner; in accordance with legal requirements." *Duly*, BLACK'S LAW DICTIONARY (11th ed. 2019). And it defines the verb "record" as: "To deposit (an original or authentic official copy of a document) with an authority." *Record*, BLACK'S LAW DICTIONARY (11th ed. 2019). Further, it is implicit in our case law dating back to at least the early half of the twentieth century that "duly recorded" simply means that a document has been properly filed with an

(continued . . .)

only that the governing documents were properly recorded with the county recorder. And we found this fact relevant in *Swan Creek* because the recorded documents imparted notice to the defendant. 2006 UT 22, ¶ 38 ("[T]he HOA's articles of incorporation and the Declaration were on file and had been on file for years before [the defendant] acquired her lots.").

¶70 The facts here are similar. While Frank disputes the validity of the governing documents, there is no dispute that they were "duly recorded." And the district court properly found this relevant, observing that the articles of incorporation and protective covenants were on file when the trusts purchased the Lots—and had been for decades.

¶71 But we take Frank's point that the allegations here differ substantively from the facts in *Swan Creek*. There, the defendant alleged that the replacement homeowners association was invalid. *Id.* ¶ 30. No one, however, alleged what Frank does here—that the HOA was *never* validly established. For this reason, *Swan Creek* is not directly controlling. But we conclude that the principles underlying *Swan Creek* apply to the circumstances here, and therefore we extend the rationale of that case to the facts before us.

¶72 Although an encumbrance on real property was involved in *Swan Creek*, we were willing to excuse rigid adherence to the Statute of Frauds' general writing requirement because, among other things, there was notice of the encumbrance (because it was

---

entity in a manner that provides notice of its contents and legal effect. *See, e.g.*, *McCready v. Fredericksen*, 126 P. 316, 316 (Utah 1912) ("[S]aid certificate was *duly recorded* in the office of the county recorder of Salt Lake county, Utah, on the 22d day of March, 1897, in a book therein provided by law to be kept for that purpose, to wit, Book A of Tax Sales, page 27, line 18, of the records of said county." (emphasis added)); *Nat'l Realty Sales Co. v. Ewing*, 186 P. 1103, 1104 (Utah 1920) ("After the period of redemption had expired, to wit, on January 20, 1917, said sheriff made and executed a sheriff's deed to H. J. Ewing for the said lands which deed was *duly recorded* in the office of the county recorder for Utah county on said day." (emphasis added)); *Ferguson v. Mathis*, 85 P.2d 827, 828 (Utah 1938) ("The mortgage was *duly recorded* the following day in the office of the County Recorder of Carbon County." (emphasis added)).

duly recorded), the encumbrance had been in place for a significant period before the defendant challenged its validity, and during that time the affected landowners' conduct demonstrated acceptance of the encumbrance and acquiescence to the homeowners association's authority. *Id.* ¶ 38–39. These guiding principles mirror the foundational concepts at work in other real property contexts where we have been willing to excuse the writing requirement, including the doctrines of boundary by acquiescence, adverse possession, and prescriptive easement. *See Q-2 L.L.C. v. Hughes*, 2016 UT 8, ¶ 10 n.15, 368 P.3d 86 (explaining that boundary by acquiescence requires, among other things, "occupation" and "mutual acquiescence" for "at least 20 years" (cleaned up)); *Anderson v. Fautin*, 2016 UT 22, ¶ 25, 379 P.3d 1186 ("[O]ne who claims property by adverse possession must show that his use and possession of the property has been actual, open and notorious, and continuous for the statutory period." (cleaned up)); *Kiernan Fam. Draper, LLC v. Hidden Valley Health Ctrs., LC*, 2021 UT 54, ¶ 41, 497 P.3d 330 ("To obtain a prescriptive easement, a party must establish a [property] use that is (1) open, (2) notorious, (3) adverse, and (4) continuous for at least 20 years." (cleaned up)).

¶73 And here, an application of those principles leads us to conclude that the conduct of the HOA members over an extended period of time—generally, the members' acquiescence to and acknowledgment of the authority of the HOA, payment of assessments to the HOA, and acceptance of benefits provided by the HOA—constitutes ratification of the HOA's authority to levy assessments against its members. Fundamentally, Frank's objection to the HOA comes too late. Frank has provided no evidence that any prior owner of the Lots objected to the HOA's authority or to the Lots' inclusion in the HOA. And all the while, the governing documents were in the public record for anyone to review.[6]

---

[6] We also note that here, as in *Swan Creek*, we are not presented with anything close to a contemporaneous objection to Charles Lewton's alleged actions. In *Swan Creek*, at the time of the homeowners association's formation, no questions were raised as to its authority and "the new [homeowners association] immediately began to act under the terms of the Declaration." *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 5, 134 P.3d 1122. Similarly, Frank has not argued nor made any

(continued . . .)

¶74 Finally, we note that the distinction Frank draws between the facts in *Swan Creek* and the circumstances here might be dispositive if we had concluded that the flaw Frank alleges rendered the governing documents absolutely void. But as we explained above, *supra* ¶¶ 43–48, the documents here are only voidable and therefore ratifiable. The only question here is whether ratification has taken place. And we conclude that the district court properly applied the principles undergirding *Swan Creek* to determine that the HOA members have collectively ratified the HOA's authority.

## III. THE DISTRICT COURT DID NOT EXCEED ITS DISCRETION IN ADMITTING THE HOA'S WITNESSES

¶75 Frank next argues that the district court erred in allowing the HOA's two witnesses to testify at the bench trial in which the court determined the amount of unpaid assessments. Frank argues that the court should have excluded the HOA's witnesses under rule 26(d)(4) of the Utah Rules of Civil Procedure because the HOA did not timely disclose them. And Frank contends that if they had been excluded, the HOA would have no evidence establishing the amount of the assessments owed, resulting in a failure of the HOA's claim.

¶76 Rule 26 requires parties to make discovery disclosures "based on the information then known or reasonably available to the party." UTAH R. CIV. P. 26(d)(1). If a party fails to timely disclose a witness or other material, "that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." *Id.* R. 26(d)(4).

¶77 The HOA disclosed two witnesses the month before the bench trial as part of its pretrial disclosures: Ryan Bonham, the HOA manager; and Sheila Adler, the HOA president, whom the HOA designated as its corporate representative. Frank argues that this was prejudicial because it left him unable to depose the witnesses and prepare for trial.

---

showing that any previous owner of the Lots objected to the Lots' inclusion in the HOA or the formation of the HOA. While Frank asserts that Charles Lewton encumbered land that he did not own, there is no record evidence that any prior owner of the Lots did anything other than acquiesce to Charles Lewton's actions.

¶78 But the district court concluded that any failure to disclose was harmless. It noted that Bonham "had been in play for many years," as the HOA had filed several declarations from him as manager and registered agent of the HOA. On this basis, the court "struggle[d] to find . . . prejudice."

¶79 And the district court noted that although the HOA disclosed Adler for the first time in its pretrial disclosures, the HOA had disclosed the previous HOA president as its corporate designee. When Adler replaced the prior president, the HOA failed to update its corporate designation to show that Adler was now in the position. The district court concluded that this failure to update was harmless under the specific circumstances of the case, noting "I do not think that . . . a violation, if there was one, under Rule 26, would be harmful in any way. . . . We're talking about the . . . foundation to admit the documents that everybody heretofore in hundreds and hundreds of pages of briefing have all acknowledged as the controlling documents. So it does not appear to be an issue that's generally in dispute."

¶80 "We review a district court's decision on sanctions under rule 26(d)(4) [of the Utah Rules of Civil Procedure] . . . for an abuse of discretion." *Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 12, 445 P.3d 434. Here, the district court concluded that the HOA's failure to disclose the two witnesses prior to its pretrial disclosures was harmless, and it explained its reasons for reaching that determination. Given the court's familiarity with the case and the evidence, we cannot conclude that it abused its discretion on this record.

## IV. THE DISTRICT COURT DID NOT EXCEED ITS DISCRETION WHEN IT DENIED FRANK'S MOTION TO AMEND

¶81 Frank next argues that the district court erred in denying his motion to amend his answer to add counterclaims against the HOA. "Trial courts should liberally allow amendments unless the amendments include untimely, unjustified, and prejudicial factors." *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 58, 221 P.3d 256. However, "[t]he granting or denial of leave to amend a pleading is within the broad discretion of the district court, and we will not disturb the district court's decision absent a showing of an abuse of that discretion." *Bresee v. Barton*, 2016 UT App 220, ¶ 14, 387 P.3d 536 (cleaned up).

¶82 Frank argues that the district court abused its discretion because, although the case was already five years old when he moved to amend, the delay was not his fault. And although the

discovery deadline had passed, discovery had not yet actually begun and no trial date had been set.

¶83   However, although the district court could have chosen to allow Frank to amend his answer, we cannot say that it abused its discretion in denying his motion. The case had been pending for five years, and the court had before it a fully briefed summary judgment motion. Among other reasons the court gave for its decision, it explained that "part of this case is five years old, and these are all claims that . . . Frank has known about for years and that could have been brought at the beginning of this case." The court thus concluded that "bringing them now . . . would be unnecessary, prejudicial and would unduly delay the litigation that has already been delayed substantially." (Cleaned up.) On this basis alone, we do not find the court's decision to be an abuse of the court's discretion. Accordingly, we do not disturb the court's ruling.

## V. WE MAKE NO AWARD OF APPELLATE ATTORNEY FEES

¶84   Finally, Frank argues that "if this court reverses for any of the reasons discussed above, the HOA will no longer be the prevailing party," so we should reverse the district court's award of attorney fees to the HOA. Because we affirm the court's rulings, we do not disturb the award of attorney fees below.

¶85 Frank also points out that the HOA did not ask for attorney fees on appeal and contends that, even if the HOA prevails on appeal, we should not award appellate attorney fees because rule 24(a)(9) of the Utah Rules of Appellate Procedure requires a party to make that request explicitly. "Typically, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Beckman v. Cybertary Franchising LLC*, 2018 UT App 47, ¶ 93, 424 P.3d 1016 (cleaned up). However, rule 24(a)(9) states, "[a] party seeking attorney fees for work performed on appeal must state the request explicitly and set forth the legal basis for an award." UTAH R. APP. P. 24(a)(9). We agree with Frank that because the HOA did not make such a request, it is not entitled to an award of the attorney fees it incurred in this appeal.

## CONCLUSION

¶86   As we determined in *WDIS II*, which involved the same HOA and the same governing documents, the HOA's governing documents are voidable rather than absolutely void. Accordingly, the HOA's authority is subject to ratification. We conclude that

the principles underlying our analysis in *Swan Creek* should be extended to the circumstances here. And under those principles, we agree with the district court that the HOA's members have ratified its authority, including its authority to assess lot owners. Finally, we conclude that the district court did not abuse its discretion in admitting the HOA's witnesses at the bench trial or in denying Frank's motion for leave to amend his answer, and the HOA is not entitled to appellate attorney fees.

¶87   Accordingly, we affirm.

———————————